## STATE v. FOSTER.

## BOARD OF COMMISSIONERS OF LARAMIE COUNTY v. SAME.

TRUST FUNDS—INSOLVENT BANK—PUBLIC MONEYS DEPOSITED IN BANK—ASSIGNMENT FOR BENEFIT OF CREDITORS—PREFERENCE OF STATE AND COUNTY OVER GENERAL CREDITORS—PRESUMPTIONS.

1. A valid deed of assignment for the benefit of creditors, at common law, is a transfer of title by the debtor to his

assignee, and vests the property in the assignee, secure from any claim of preference or priority of payment of the State or any municipality therein.

2.  The same rule prevails under the statute; as the assignment passes the title, and the preference of the State or county, if any existed, is thereby defeated.

3.  By reason of Section 40, Article 3, of the constitution, which prohibits the exchanging, transferring, remitting, releasing or postponing or in any way diminishing of any obligation or liability held or owned by the State or any municipal corporation therein, except by the payment thereof into the proper treasury, a payment or dividend out of an insolvent estate upon a claim of the State or county will not operate as a release of an unpaid portion of the debt.

4.  State and county treasurers are but custodians of the public funds coming into their hands by virtue of their office; such moneys remain, at all times, public moneys while in their official possession, or in the hands of their depositaries.

5.  Upon the deposit of such moneys with a bank, the latter, having knowledge of the trust character of the funds, and keeping his accounts with the treasurer as such, becomes a quasi trustee, standing in the shoes of the depositing treasurer.

6.  Under such circumstances an action may be brought for the recovery of the same as trust funds, by the proper public authorities.

7.  Such moneys, however, cannot be recovered from an assignee for benefit of creditors unless they can be traced into the estate of the trustee, and the corpus of the fund is found, and, in some form, identified.

8.  When the trust moneys are mingled with those of the trustee, the trust may be impressed upon such fund or property with which they are mingled; but if the trust moneys are dissipated or lost there is no fund to impress with the trust, and the sole remedy of the beneficiary is a proceeding against the trustee personally.

9.  The presumption is, that, when the trustee has paid moneys out of a fund consisting of his own and trust moneys intermingled, he has paid out his own money, and if there be any money on hand at the time the trust is

sought to be enforced, the presumption applies, and the remaining moneys will be presumed to be the trust funds.

[Decided January 5, 1895.]

Reserved questions from District Court for Laramie County. Hon. Richard H. Scott, Judge.

These were separate actions by the State and the Board of the County Commissioners of the County of Laramie against Joel Ware Foster, assignee for the benefit of creditors of Thomas A. Kent, to have declared a trust upon the estate of the insolvent in the hands of the assignee, for certain public moneys deposited with said insolvent as a banker by the State and county treasurer respectively. The facts are fully stated in the opinion.

*Charles N. Potter,* Attorney General, for the State.

(*Joel F. Vaile,* of counsel.)

The moneys of the State in the hands of its treasurer, deposited with the bank, became trust funds in the possession of the bank. (McCall v. Frazier, 40 Hun., 113; Eels, etc., v. Robinson, 13 Cal., 134.) The funds of the estate of the banker at the time of the assignment are charged with a trust as part of the funds of the State. (Peak v. Ellicott, 30 Kan., 156; Ellicott v. Barnes, 31 id., 170; People v. Bank, 96 N. Y., 35; Frelinghuysen v. Nugent, 36 Fed., 239; In re Armstrong, 33 id., 405; Bank v. Armstrong, 36 id., 39; 40 id., 46; Bank v. Ins. Co., 104 U. S., 54; Bank v. Hummel (Colo.), 23 Pac., 986; Hummel v. Bank (Colo.), 32 Pac., 72; Smith v. Combs, 24 Atl., 9; Griffin v. Chase, 54 N. W., 572; Anheuser, &c., Brew. Co. v. Bank, 53 N. W., 1037; San Diego Co. v. Bank, 52 Fed., 59.) If the funds of the State were mingled with the funds of the banker, his estate is charged with the trust. (McClure v. Board, 19 Colo., 122; Myers v. Board, 51 Kan., 87; Hubbard v. Adam, &c., Co., 53 id., 637; Ind. Dist. v. King, 45 N. W., 908.) The funds deposited with T. A. Kent, banker, by the State treasurer, belonged to the State. (R. S., sec. 1696; Art. 14, Const., sec. 7.) A debt due the State is entitled to preference over debts due to individuals. (1 Blackstone, 240; 2

id., 409; 3 id., 420; Brooms L. Max, 69; Giles v. Grover, 1 Cl. & F., 72; 9 Hen. III, chap. 18; 25 Edw. III, chap. 19; 33 Hen. VIII, chap. 39, sec. 74; 13 Eliz., ch. 4; State v. Rogers, 2 H. & McH., 125; Murray v. Ridley, 3 id., 175; Contee v. Chew's Excr., 1 H. & J., 417; State v. B'k, 6 G. & J., 205; Smith v. State, 5 Gill, 45; Green's Est., 4 Md., Ch., 356; State v. Mayor, &c., 10 Md., 515; Orem, Ex'x, v. Wrightson, 51 id., 42; Robinson v. Bank, 18 Ga., 96; Com. v. Cook, 8 Bush., 224; State v. Rowse, 49 Mo., 586; Com. v. Lewis, 6 Binn., 270.) A voluntary assignment does not defeat such right of preference. If the sovereign—the State— is not expressly mentioned in the statute, it will not be bound. (Willion v. Berkley, 1 Plowd., 239a; U. S. v. Hoar, 2 Mason, 311; People v. Gilbert, 18 Johns., 227; Com. v. Johnson, 6 Pa. St., 136; Josselyn v. Stone, 28 Miss., 753; U. S. v. Green, 4 Mason, 427; U. S. v. Hughes, Crabbe, 307, 313; State v. Garland, 7 Ired., 48; Sav. Bank. v. U. S., 19 Wall., 227; Feather v. The Queen, 6 Best & Sm., 257; Dixon v. London, &c., Co. (L. R.), 1 App. Cas., 632; Divine v. Harvie, 7 T. B. Mon., 439; Den v. O'Hanlon, 21 N. J. L., 582; Trustees, &c., v. Trenton, 30 N. J. Eq., 667; State v. Kelsey, 44 N. J. L., 44; Rex v. Pixley, Bunb., 202; Temple, ex parte, 2 Ves. & B., 394; People v. Rossiter, 4 Cow., 143; People v. Herkimer, 4 Cow., 345; Saunders v. Com., 10 Gratt., 494; Com. v. Hutchinson, 10 Pa. St., 466; Clemens v. Camden, 51 N. J. L., 426; Greeley v. Prov. Sav. B'k, 98 Mo., 458.) The language of the assignment law shows that it was not intended to apply to the State, to the extent of placing its claims upon the same level as those of ordinary creditors. Under that law the assignee takes the property, subject to the equitable lien of the State, for the amount due to it. (Dunlap v. Gallatin, 15 Ill., 7; cases cited above.) The provision of the constitution is controlling upon this subject. (Art. 3, sec. 40.) See for general application 1 Sugden on Powers, 274; In re Fulton's Est., 51 Pa. St., 211; Luddington's Pet'n, 5 Abb. N. C., 313; Gifford v. Black, 22 Ind., 444.

*J. A. Van Orsdel, A. C. Campbell* and *Frank H. Clark,* for the county, cited same authorities as above.

*Baird & Churchill* and *Lacey & Van Devanter*, for defendant.

Wherever the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted, if its identity can be traced, it will be held in its new form liable to the rights of the original owner cestui que trust; and conversely, if its identity cannot be traced, the remedy of the cestui que trust against any specific property is lost. (2 Story's Eq. Jur., Sec. 1258; 2 Pomeroy's Eq. Jur., Sec. 1051; 2 Perry on Trusts, Sec. 835 et seq.; Cavin v. Gleason, 105 N. Y., 256; Atkinson v. Rochester, &c., Co., 114 N. Y., 168; Little v. Chadwick, 151 Mass., 109; Nonotuck S. Co. v. Flanders, 87 Wis., 237; Peters v. Bain, 133 U. S., 670; Bank v. Armstrong, 39 Fed., 684; Bank v. Dowd, 38 id., 172; Multomah Co. v. Bank, 61 id., 912; Bank v. Bank, 15 id., 858; Phelan v. Bank, 4 Dill., 88; Holden v. Piper (Colo.), 37 Pac., 34; Shields v. Thomas, 71 Miss., 260; Wilson v. Coburn, 35 Neb., 530; Phillips v. Overfield, 100 Mo., 466; Parker v. Jones, 67 Ala., 234; St. L. B. Ass'n, 100 id., 313; Akin v. Jones, 93 Tenn., 353; McAfee v. Bland (Ky.), 11 S. W., 439; Slater v. Oriental Mills, 18 R. I., 352; Neely v. Rood, 54 Mich., 134; Sherwood v. Bank, 94 id., 78; Bank v. Goetz, 138 Ill., 127; Wetherill v. O'Brien, 140 id., 146; Mutual Ac. Asso. v. Jacobs, 141 id., 261; Thompson's Ap., 22 Pa. St., 16; In re Columbian B'k, 147 id., 440; Peoples B'k Ap., 93 id., 107; Bank v. Stillwater G. Co., 36 Minn., 75; In re Bank, 58 id., 5; Ferchen v. Arndt (Or.), 37 Pac., 161; Englar v. Offutt, 70 Md., 78; Lathrop v. Bampton, 31 Cal., 17; Goodell v. Buck, 67 Me., 514; Steamboat Co. v. Locke, 73 id., 370; Dyer v. Jacoway, 42 Ark., 186; Bank v. Davis, 114 N. C., 343.) State not preferred unless through some statutory or constitutional provision, or unless through what is known as Crown's prerogative. No statute gives preference. Constitution does not unless it be Sec. 40 of Art. 3. That section does not deal with matters of preference. The weight of authority is that Crown prerogative of preference

is not in harmony with our institutions. (19 Wall., 239; Board v. Bank, 29 N. J. Eq., 268; 30 id., 311; State v. Harris, 2 Bailey, 598.) If Crown's prerogative prevailed in Wyoming no such preference in case at bar. Crown's preference was a right enforced by extent. Extents were in chief and in aid, but of equal force. (Giles v. Grover, 9 Bing. 526; id., 542; id., 580.) King's priority was not a lien. (2 Tidd's Pr., sec. 1053; Grover v. Giles, 9 Bing., 519.) The preference is lost by alienation of the property. (6 Gill. & J., 226.) By assignment for benefit of creditors title passed from debtor. (Burrill on As'g'ts, sec. 6; L. 1890, pp. 84, 85, 89.) The transfer was not by operation of law, but by debtor's act and deed.

GROESBECK, CHIEF JUSTICE.

These actions were brought in the district court for Laramie county and by that court were reserved to this court for decision upon certain important and difficult questions arising in them. They were consolidated in the trial court for the purposes of argument and determination and are so considered here, as they present substantially the same questions. The relief sought is of an equitable nature, to impress a trust in favor of the State of Wyoming and the County of Laramie to the amount of certain public funds by the respective treasurers of the State and county deposited in the banking house of Thomas A. Kent, an insolvent debtor, at Cheyenne, in this State, upon the estate of such insolvent in the hands of the defendant as assignee. The court below entered findings of fact in each case, which disclose the following important facts: The assignor, Thomas A. Kent, was engaged in a general banking business prior to his assignment. While doing business as a banker, he received deposits from the treasurer of each of the plaintiffs, all of which were placed to the credit of such treasurer, as treasurer, and which were from time to time checked upon. At the time of the assignment, there was a balance due upon the account with the treasurer of the State of Wyoming in the sum of $56,454.70,

and a balance due to the treasurer of the county of Laramie in the sum of $16,153.98. The balance in favor of the State treasurer were funds belonging to the State of Wyoming and the balance in favor of the treasurer of Laramie county was the property of said county, and these moneys had been received by said Kent with knowledge of such ownership.

Neither of the treasurers had authority to deposit any of the funds with said Kent, as banker, unless such authority is to be presumed by reason of the fact that for at least eighteen years last past the treasurers, both of the territory and the State, with the knowledge of the people, and of the officials of the State, had been accustomed to deposit the funds of the territory and of the State in the manner that the funds in question were deposited; and that in like manner, for the same period of time, the treasurers of Laramie county, with the knowledge of the people and officials of the county, had likewise deposited the county funds in the custody of such treasurers, as such, with bankers in the same manner as was done in the present instance. The moneys belonging to each of the plaintiffs and all other moneys of said Kent, as banker, were paid out to depositors on checks in the ordinary course of business, excepting that there remained in the vaults at the bank at the time of the assignment, the sum of $2,058.72 in cash, and also on deposit in other banks the sum of $1,684.32. None of the real and personal property assigned by the said Kent to the defendant, as assignee, was either bought or paid for subsequent to any of the deposits of the public funds by either of the plaintiffs with the said Kent. Loans were made by him aggregating about $15,000, while the greater part of said public moneys were on deposit in the said bank, but at the time when each of the said loans were made, said Kent, as banker, had, after deducting the amount of said loans, in cash, a sum largely in excess of the aggregate due to both of the plaintiffs. None of the money of either of the plaintiffs came into the hands of the defendant, unless the moneys remaining in the vaults of the bank and on deposit with other bankers are presumed to be moneys of plaintiffs, and the estate that came to his hands

has not been increased by said moneys, or their use in paying debts by the insolvent.

Upon these findings, the court made the following order reserving the causes for decision to this court:

"And the court and the judge thereof, does now, after due consideration, believe and find that important and difficult questions arise in this action, which render it both proper and necessary that this cause should be reserved and sent to the Supreme Court for its decision upon such important and difficult questions. And the court and the judge thereof believe and find that the said important and difficult questions arising in this action are as follows:

"First. Do the facts that the treasurer of the plaintiff deposited the public funds of the plaintiff with T. A. Kent, banker, in the manner above found, and with no authority except as above found, and that said Kent, as banker, paid out the sums upon checks of his depositors in the ordinary course of business, said depositors being creditors to the amounts of the checks so drawn and that said Kent thereafter being insolvent, made and executed a general assignment for the benefit of all his creditors, under the assignment law of the State of Wyoming, entitle the plaintiff to a lien upon, and a prior payment out of, any of the assets in the hands of the defendant as assignee for the benefit of the creditors of the said Kent as against said defendant as assignee, and as against the general creditors of said assigned estate, said assigned estate being insolvent to the extent above found?

"Second. If question number one shall be answered in the affirmative, against which particular assets is the plaintiff entitled to such lien, and out of which particular assets is the plaintiff entitled to such prior payment?"

After the submission of the questions to this court, a reargument was ordered upon the question of the priority or preference of payment of the State and the County of Laramie, and able and exhaustive arguments were made upon this question. Owing to the limited time within which the delicate questions to be disposed of must be determined, caused

by an impending change in the personnel of this court, the discussion of the points involved will, of necessity, be limited, but it is desirable that a speedy determination of the matters presented by the district court should be had owing to the reason above assigned, the magnitude of the case, the importance of the questions involved and the necessity of facilitating the settlement of the estate of the insolvent.

1. It is urged with great force that under the common law and the constitution of this State, the State and the county of Laramie have a preference or priority of payment over the general creditors of the insolvent debtor in the distribution of his estate in the hands of his assignee by a deed of assignment executed by the debtor in trust for all his creditors without preference or priority, under the provisions of the Voluntary Assignment statute of this State. (Ch. 51, Sess. Laws 1890.) It is asserted that the State of Wyoming and her municipality, the county of Laramie as a subdivision thereof for certain governmental purposes has succeeded to the prerogative of the British sovereign, that his debt should be preferred to that of his subject, and that this prerogative has become to the States of the American Republic, an attribute and incident of sovereignty. Two familiar maxims are quoted as the quintessence of the British law: "Quando jus domini Regis et subditi insimul concurrunt, jus Regis præferri debit," and "Thesaurus Regis est vinculum pacis et bellorum nervus." These maxims, it is said, should apply to the State, and her revenues should be protected with as much solicitude as those of the British King, as though her treasury may not be the "bond of peace and the sinew of wars," yet she stands in the attitude parens patriæ charged as she is directly through her municipal subdivisions with the government of the people; in the enforcement of the law and the rights of her citizen through her tribunals of justice; in the maintenance of the public order and the execution of the laws; in the education of the young; in the support of the indigent; in the work of internal improvement and in the various agencies of government that the State controls in the interest of her citizens. As liens are created by her posi-

tive statute upon both realty and personalty on which they are imposed, it is contended as much concern should be manifested in the preservation intact of the public moneys which are the fruits of taxation.

The source of this power and right of preference, it is asserted, is grounded mainly on the common law and upon certain provisions of our constitution.

Whatever of the common law is in force in this jurisdiction is here by the terms of the statute adopting it, enacted at an early day and incorporated in section 498 of the Revised Statutes of Wyoming. It reads as follows:

"The common law of England as modified by judicial decisions, so far as the same is of a general nature, and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law, prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of the thirteenth Elizabeth, and the ninth chapter of thirty-seventh Henry Eighth), and which are of a general nature and not local to England, shall be the rule of decision in this Territory (state) when not inconsistent with the laws thereof, and shall be considered as of full force until repealed by legislative authority."

The British statutes excepted from this act of adoption are: "An act for avoiding trifling and frivolous suits in her Majesty's courts at Westminster" (Stat. 43 Eliz., ch. 6, sec. 2), "An act against usury" (Stat. 13 Eliz., ch. 8), "A bill against usury" (Stat. 37 Henry VIII, ch. 9). The period fixed for transplanting the common law into this country and the time in which it is considered as having effect in this jurisdiction is the fourth year of James First, the period when the first territorial or colonial government was established in America and with it the common law of England as it then existed. Penny v. Little et al., 3 Scammon (Ill.), 304. The charter to Gates, Somers and others for the colony of Virginia was granted in the fourth year of that monarch, on the 10th day of April, 1606, and by it provision was made for the establishment of a government in the wilds of America

which should rest upon the reason, the experience and the luster of the British jurisprudence. By our statute, the common law is adopted with "all declaratory and remedial acts or statutes made in aid of or to supply the defects of the common law," prior to the time when the first colonial government was established by England upon American soil, with the exception of certain statutes mentioned, and these curative and remedial statutes must be as well consulted as the common law in order to ascertain the body of law adopted here.

The right of the crown to have its debts preferred was of very ancient origin and was recognized in Magna Charta. It was held to be an incident to sovereignty and not as a personal right attaching to the king's person. It was modified by a number of statutes which were incorporated in the body of the common law by our act of adoption. These were the statutes of 9 Henry III, stat. 1, ch. 18; of 25 Edward III, ch. 19, and of 33 Henry VIII, ch. 39. By them, the prerogative of the crown was shorn of its original oppressive character. Anciently, the subject had first to pay "gree" or satisfaction to the king of the king's debt, before he could have execution against the king's debtor; and if he sued the king's debtor without first satisfying the king's debt, the writ of protection ran against the subject seeking his remedy or process against the king's debtor. The last statute in point of time (33 Henry VIII, ch. 39), as construed in the case of Giles v. Grover in the House of Lords, decided in 1832, as appears from the opinions of the judges (9 Bingham, 515), permitted the subject to secure judgment and obtain process thereon against the king's debtor, without first making "gree" or satisfaction, but the king had the right to pursue his remedy concurrently with the debtor even after the judgment of the latter and even if process had been issued and executed thereon, if the title to the property remained unaltered in the debtor; and the king's process in such a case, although issued after the process of the subject was entitled to preference. The proceedings between sovereign and subject is aptly termed in the opinion of one of the judges "a

race with the crown." It was held that the sheriff holding the property of the king's debtor, seized under a fieri facias but not sold, could not defeat the subsequent process of the king, either by extent in chief or in aid, which were in effect deemed the same, for the reason that before the sale of the property seized under the fi. fa. the title to the property had not been divested from the debtor and the king's process should have preference, although subsequent to that of the subject creditor. It was conceded upon the argument in the case and so held by the court that the crown could not avoid an equitable mortgage, or the lien of a factor or of a wharfinger or of "a bona fide assignment in trust for creditors." See opinion of Patteson, J., p. 520. This is stated in Tidd's Practice, 1052-53, King in aid of Braddock v. Watson, 3 Price, 6, and is undoubtedly the rule in England that the transfer bona fide of the debtor's property while he has absolute dominion over it, defeats the king's prerogative right and his preference and priority is lost. So it was held in the much cited case of State v. Bank of Maryland, 6 Gill. & Johns., 228 (Maryland), and in a State that recognizes this common law prerogative of the king as in force and applying to the State. So, as a valid deed of assignment for the benefit of creditors under the common law is a transfer of the title by the debtor to his assignee, and vests the property in the assignee secure from any claim of preference or priority of payment of the King, it is clear that the assignment of Thomas A. Kent, the insolvent, executed before the inception of these actions at bar, would defeat the preference of the State and of any municipality therein, even if the common law as modified by British statutes adopted by our statute with it, were in this particular the law of Wyoming. Bump on Fraudulent Conveyances, 330; Burrill on Assignments, sec. 6.

In the case of Seay v. Bank of Rome, 66 Ga., 615, it is remarked that the assignee of an insolvent debtor "takes the assets subject to the preference and priorities that the law gives," and the Georgia Code, sec. 1493, is cited in support of that proposition. This section reads: "When a bank

surrenders its charter, or the use thereof, it may make, in good faith, an assignment of all its effects for the payment of its debts, as natural persons may, but it cannot thereby prevent such preference among its creditors as the law gives." The common law rule is that a general assignment passes the title. Our statute provides the same thing in effect, and it does not provide that the title shall not pass. It authorizes a debtor to make a general assignment without preference or priority of creditors; it requires that this shall be done by indenture, which is the usual method of passing title; it speaks of the assignment as "conveying" an interest; the assignee is empowered to sell by virtue of the indenture and recording, and without waiting for an order of the court; the power of the court over the estate is by the words of the statute, simply a "supervising" power; another section contemplates that the execution and filing of the assignment shall "transfer the property of the assignor;" another, provides that exempt property does not pass to the assignee; and if property is fraudulently conveyed by the assignor, the assignee may recover it or its value from the person who has fraudulently obtained it. Ch. 51, Sess. Laws 1890.

Hence, neither under the common law nor our statute of assignments, could the State and the county have any preference or priority as the title passing by the deed of assignment, the assignment and transfer defeats the preference or priority of the sovereign. It is not certain that the common law prerogative of the king in this respect is applicable in this country, where it has been held to be contrary to the spirit of our institutions. It has been adopted by statute by act of Congress, and it would seem a proper exercise of the legislative power. The decisions of American courts are somewhat conflicting. They are collected in a foot note to the case of Freeholders of Middlesex Co. v. State Bank, 30 N. J. Equity (3 Stew.), 311, where the opinion of the Vice Chancellor denying the priority is affirmed upon his opinion. 29 N. J. Eq., 268. We do not care to decide this point, as it is unnecessary to do so. The assignment of the insolvent's prop-

erty, both under common law and under our statute, passed the title, and no process could thereafter run against the property, either that of the State or the citizen, and the preference or prior right, if any existed, is thereby defeated.

The following constitutional provision is invoked as giving a preference or priority to the State and its municipalities over the citizen: No obligation or liability of any person, association or corporation, held or owned by the State, or any municipal corporation therein, shall ever be exchanged, transferred, remitted, released or postponed, or in any way diminished by the legislature; nor shall such liability or obligation be extinguished except by the payment thereof into the proper treasury." Art. 2, sec. 40, Con. Wyo. The Revised Statutes of the Territory of 1887, and the territorial session laws following (1888 and 1890) were declared by an act of the first State legislature to be the laws of the State, in so far as they do not conflict with and are not repugnant to the provisions of the constitution. Sess. Laws 1890-91, Ch. 35. It is contended that the territorial assignment law (Ch. 51, Sess. Laws 1890, supra) in so far as it compels a release of the claim of a creditor in full upon the acceptance of the final dividend on the distribution of the estate of an insolvent can not apply to the State or the county because such a provision is repugnant to the constitutional provision upon which the State and the county must receive the full amount of their respective claims. The provision of the constitution is that no liability or obligation owned or held by the State or any of its municipalities shall be extinguished except by payment thereof into the proper treasury. It does not create either in express terms or by implication a preference or priority in favor of either the State or its municipality as against its citizen in the payment of the debts of a common debtor, and has no reference to the question of such priority or preference. It seems that if Kent, the insolvent assignor, is a debtor to the State and to the county of Laramie, his debt to either of them can not be extinguished by a partial payment. A payment or dividend out of the insolvent estate might be made pro tanto, but could not oper-

ate as a release of the unpaid portion of the debt, as the assignment law provides, because the constitution expressly forbids the extinction of such a debt except by payment into the proper treasury.

2.   The remaining question to be decided is that of following the trust moneys belonging to the State and the county into the estate of Kent, the insolvent debtor.

Upon the deposit of these public funds in his bank, he became a quasi trustee, as he stood in the shoes of the depositing treasurers, having knowledge of the trust character of the funds and having kept his accounts with the respective treasurers as such. Under our constitutional and statutory provisions, it is clear that the State and the county treasurers are but custodians of the public funds coming into their hands by virtue of their office, and that such moneys remain at all times public moneys while in their official possession or in the hands of their depositaries. The statutes of this State are similar to those of Colorado, and in that State, it is held that county moneys received and collected by a county treasurer, belong to the county, which may maintain an action to recover the same. McClure v. Board of Com'rs, 19 Colo., 122; Sauer v. Nevadaville, 14 Colo.; 54; 23 Pac., 87; see State v. McFetridge, 84 Wis., 473. In Michigan it was held that a State treasurer as to State funds held a different relation to the State than a county treasurer bears to his county, under the peculiar provisions of the statutes of that State. (Perley v. County of Muskegon, 32 Mich., 132); but we think no such distinction exists here. In the Michigan case just cited, it was intimated that in the case of the death of the county treasurer, the moneys held by him in his official capacity, would go to his administrator and not to his successor, but our statute requires the executor or administrator of a deceased county treasurer, under severe penalties and increased liabilities to deliver up, on demand, the books, moneys and papers of the deceased county treasurer. Rev. Stat., sec. 1828. Then, as is ordinarily the case under like statutory provisions to ours, it appears the moneys received by either a State or a county treasurer

in this State by virtue of the office, are considered as public moneys and the State or the county may maintain an action like the ones at bar to charge with a trust the property purchased with such public moneys or the moneys in whatever form or transmutations they may have undergone, provided they can be traced or identified. A difficulty arises under the findings of the district court in these cases, as it does not appear that the public funds deposited with Kent can be traced or have been traced into any specific fund or property. Their deposit is found to be a general and not a special deposit, and they were evidently not to be returned in specie, but in equivalents. They can be traced to the possession of the insolvent, the assignor and into his estate, but no further. No particular property is discovered into which they were converted or found their way, or for which they were substituted, but the findings, on the contrary, are that they went into the mass of the funds of the bank and were applied generally to the payment of the debtors, including the mass of depositors in the usual course of business. There is no property of the insolvent estate, other than the moneys on hand and the balances due and owing to Kent from other banks at the time of his assignment which can be considered to represent any portion of the trust moneys. Some loans were negotiated by Kent and passed by the assignment, but at the time of the assignment there was in the vaults of the bank only the sum of $2,058.72 in cash and on deposits in other banks the sum of $1,684.32.

In following trust funds, they must first be traced to the estate of the trustee or quasi trustee, and the corpus of the funds must be found. It must be in esse in some form, or it can not be identified. Where the trust moneys are mingled with those of the trustee, the trust may be impressed upon such fund or property with which it is mingled, but if it appears that the trust moneys are dissipated or lost, there is no fund to impress with the trust, and the sole remedy of the beneficiary is a proceeding against the trustee personally. Where he is solvent, this is the usual remedy pursued, as by judgment and execution the whole estate can

be impressed with the amount of the judgment. Some of the courts have held as the "modern" equity doctrine that all that is necessary is to trace the trust moneys into the estate of the trustee, which then becomes impressed with the trust. This was the rule established by a number of cases in the Supreme Court of Wisconsin until a return to the general rule was announced in Nonotuck Silk Co. v. Flanders, 58 N. W., 383, and the former cases were overruled. The leading cases on the subject are those of Cavin v. Gleason, 105 N. Y., 256, 262; Little v. Chadwick, 151 Mass., 108, and Slater v. Oriental Mills (R. I.), 27 Atlantic, 443.

That the money constituting the trust may have been wrongfully converted by the defaulting or delinquent trustee, does not seem to alter the situation as some of the courts hold. There is no peculiar sanctity that surrounds an action ex delicto as distinguished from an action ex contractu, at law, so far as the obtaining satisfaction of any judgment is obtained, and when equity is invoked in the former cases, equitable rules must be applied. Where no specific lien is created by contract or the acts of the parties, none exists. The only course open in equity is to discover the corpus of the trust fund, or to follow the changes and transmutations of the trust moneys into some particular property that can be charged with the trust, saving the rights of innocent purchasers for value. The courts generally have gone as far as it seems possible in holding that the presumption always is that the trustee has used his own funds in his business operations and if there be any money on hand at the time the trust is sought to be enforced, that presumption controls. So the trustee who has blended trust moneys with his own is not permitted to say that he has used trust moneys when he had a right to use his own. This appears to be one of the principles that governed the decision in the famous case of Knatchbull v. Hallett, 13 Ch. Div., 696, which overruled some prior English decisions. It is to the effect that if a person who holds money as a trustee, or in a fiduciary character, pays it to his account at his banker's and mixes it with his own money, and afterwards draws out sums by checks

in the ordinary manner, the drawer must be taken to have drawn out his own moneys in preference to the trust money. This principle pervades some of the cases which adopt the rule that the entire estate of the trustee is impressed with the trust moneys traced to it. In Kimmel v. Dickson (S. D.), 58 N. W., 561, the moneys found in a defunct bank amounted to $259.71, while the amount left there by the plaintiff before it failed to be used for the payment of his note was $265.00. The case was decided upon the authority of Ellicott v. Barnes, 31 Kan., 170; Peak v. Ellicott, 30. id., 170; 1 Pac., 767, 409, and upon the case of McLeod v. Evans, 66 Wis., 401, 28 N. W., 173, 214, which had then been overruled by Nonotuck Silk Co. v. Flanders, supra, but the order of the trial court was affirmed, and that was that the receiver of the insolvent bank pay to the plaintiff "the sum found in the bank at the time of its failure, although it was less than the sum left there for the specific purpose of paying the note. So it was in the case of Massey v. Fisher, 62 Federal, 958, very recently decided. In the course of the opinion the court remarks: "It is not important that the plaintiff's money bore no mark and cannot be identified. It is sufficient to trace it into the bank's vaults and find that a sum equal to it (and presumably representing it) remained continuously there until the receiver took it. The modern rules of equity require no more." Some of the cases cited by the learned judge go farther than he, but his conclusion, though reached at the extreme limits of the rule, seems correct. The trust moneys here are traced to the bank vaults and to deposits made elsewhere, and the sum found there represents a portion of it. The amount of moneys on hand at the time of the assignment to the defendant for the benefit of the creditors of Kent constitutes the only portion of the trust moneys that can be traced and identified as trust moneys, and these only under the fiction or presumption that seems to be a well established rule of equity that the trustee is presumed to have paid out his own moneys and kept those belonging to the trust. This was tacitly conceded upon the argument by counsel for the defendant.

The commercial paper representing loans made to different parties before the assignment and passing by it to the assignee, as the court below finds, were severally exchanged for moneys when there was sufficient funds of Kent on hand out of which the loans were made. Upon the presumption as established in equity and referred to above, it must be held that these loans were made from the moneys of the trustee and not from the trust funds, and should not be impressed with the trust.

As the inquiries of the district court have been answered generally by this opinion, it will not be necessary to specifically answer the questions propounded.

CORN and BLAKE, JJ., concur.

[Hon. J. W. Blake, Judge of the district court for the second judicial district, sat in lieu of Mr. Justice Conaway, who was disqualified by reason of his interest in the proceeding.]