## TOOELE COUNTY BOARD OF EDUCATION
### v. HADLOCK, State Bank Com'r, et al.

No. 5230.  Decided January 26, 1932.  (11 P. [2d] 320.)
Rehearing Denied May 11, 1932.

See, also, 11 P. (2d) 329.

*E. LeRoy Shields*, of Tooele, and *Fabian & Clendenin*, of Salt Lake City, for appellant.

*S. R. Thurman* and *D. M. Draper,* both of Salt Lake City, for respondents.

FOLLAND, J.

The Tooele County State Bank, hereinafter referred to as the "bank," became insolvent, and on January 14, 1931, was closed and taken over by the state bank commissioner hereinafter referred to as the "commissioner," who since that time has been in charge of the bank and its assets for the use and benefit of creditors. At the time of the bank's closing the Tooele county board of education, hereinafter referred to as the "board," had a substantial deposit in the bank. The bank when closed had cash assets made up as follows: Cash in its own vaults $10,440, on deposit in Utah State National Bank $122,646.26, on deposit in Continental National Bank $1,925.57, notes representing loans made after December 22, 1930, $3,427, a total of $138,438.83. The lowest balance of cash in the bank and its depositary banks between December 22, 1930, and date of closing, January 14, 1931, was as follows:

In the Bank (January 12) ....................$ 10,226.31
In Utah State National Bank (January 14) ..... 122,646.56
In Continental National Bank (January 13) .... 1,925.57

$134,798.44

The board on December 24, 1930, received from Isabel De La Mare, the county treasurer of Tooele county, a check for $120,000, representing taxes collected for the board, drawn on the bank against the account of Tooele county, % Isabel De La Mare, and a check for $30,000 also for taxes drawn on the Grantsville Deseret Bank against the account of Tooele county in that bank, both of which checks were on that day deposited with the bank to the credit of the board. On January 7, 1931, the board received from the state of Utah checks for $33,448.86, which were also deposited to its credit with the bank. All of these deposits

were made without taking the security required by law except for a depository bond of $15,000. From the total sum of $183,448.86, thus deposited, the board drew out prior to the closing of the bank $42,205.50. After deducting the amount withdrawn and the amount covered by the bond, the board had to its credit in the bank at the date of closing $126,244.36. This suit is prosecuted to have the last-mentioned sum impressed with a trust and ordered paid by the commissioner out of the cash assets of the bank which came into his hands, on the theory that the deposits were trust funds which augmented the funds of the bank going into the hands of the commissioner, and that such funds had been traced into his hands. The trial court after a hearing, made findings to the effect that only the deposit of $63,448.86, which included the state's checks for $33,448.86 and the check drawn on the Grantsville Bank of $30,000 had augmented the cash assets of the bank, and to that extent only was a trust fund created in favor of appellant, and that this fund had not been traced or identified in the hands of the commissioner, and inferentially held that the deposit of $120,000 was not impressed with a trust. The court gave judgment against the board and in favor of the commissioner, from which judgment the board appeals. The questions presented by this appeal are three: (a) Did the deposit of $120,000 constitute a trust fund in favor of the board? (b) Has such fund been traced into the hands of defendants? (c) Has the trust fund of $63,448.86 belonging to the board been traced into the hands of defendants?

The evidence is without serious conflict, and there is substantial agreement between counsel as to the principles of law applicable to the case. Comp. Laws Utah 1917, § 4500, as amended by chapter 46, Laws Utah 1929, p. 61, provides:

"Any public officer having public funds in his custody may deposit the same, or any part thereof, with any bank incorporated under the national banking act and doing business in this State, or with any bank or trust company incorporated under the laws of and engaged in business in this State; provided, that he require such depository to pay interest on all funds so deposited at a rate of not less than

two per cent. per annum, and that he take from such depository collateral security or a bond furnished by a surety company qualified to do business in this State."

The bank furnished no security to the board or its treasurer, and gave no bond, except a bond in the sum of $15,000. The deposits in excess of the amount of the bond were therefore made by the treasurer of the board and accepted by the bank in direct violation of the statutory provision. A trust will be impressed, if the other requirements of the law are met, on the amount of the deposit in excess of the amount of the bond. *Jarvis* v. *Hammons*, 32 Ariz. 444, 259 P. 886. Counsel for both parties are in substantial accord on the trust fund theory involved; that is, that public moneys deposited in a bank without the taking of the security required by law do not become the property of the bank, but remain as a trust fund in the hands of the bank as trustee ex maleficio in favor of the owner. The rule applicable is well stated as follows:

"Where public funds are wrongfully deposited in a bank which has knowledge of the character of the funds, they are impressed with a trust, and if such funds can be traced into the hands of the receiver of the bank, or if the assets in his hands have been increased by such deposits, such assets will be subject to such trust and the claim therefor will be entitled to a preference out of the assets." 3 R. C. L. 555. *Yellowstone County* v. *First Trust & Savings Bank*, 46 Mont. 439, 128 P. 596. See also, notes in 51 A. L. R. 1342 and 65 A. L. R. 693.

What divides the parties is that the commissioner contends that the board has not shown that it deposited any money in excess of $63,448.86, and that it has not traced and identified any money whatsoever in any specific funds which came from the bank into the hands of the commisisoner. The board, on the other hand, contends that it has established that the $120,000 deposit was equivalent to money, that it enhanced, increased, and augmented the assets of the trustee bank, and that it has traced and identified its deposits into the hands of the receiver. An

essential requirement of the law as to which there is no dispute between counsel for the parties is that, in order for funds in a bank or otherwise to be impressed with a trust, they must have increased or augmented the assets of the trustee coming into the hands of the receiver. The trial court held that the $120,000 deposit was not impressed with the trust apparently for the reason indicated in its finding that no additional money actually came into said bank by reason of the deposit of the check for $120,000. The evidence shows that the $120,000 check was deposited in the bank by the board's treasurer, and that the amount thereof was credited to the board on the books of the bank. It is contended that this amounted to a mere bookkeeping transaction whereby Tooele county was debited with the amount thereof and the board credited with a like amount; that by reason of the transaction no new money came into the bank, and therefore its assets were not increased or augmented. No case has been called to our attention, and none has been found by us holding that under circumstances such as these a deposit made in a bank by means of a check drawn on that bank will not be impressed with a trust where it would have been so impressed had the check been drawn on another bank. It is undisputed that there was in the bank more money than was required to pay the check when it was presented to the bank on December 24, 1930. The bank opened on that day with cash resources as follows: Cash in its own vaults $23,158.83, deposits in Utah State National Bank $310,118.28, or a total of $333,277.11. The assistant cashier of the bank testified that, had the board presented its check and demanded money in payment thereof, it would have been paid by draft on the Utah State National Bank. The transaction was one equivalent to the board demanding and receiving its money and thereafter placing it on deposit in the bank to its credit. Had this been done, there would have been no difference in the status of the deposit from that of the $66,448.86 which the court found to have been impressed with a trust. The authorities sustain the view

that this is an augmentation of the funds and is sufficient to satisfy the requirements of the law in that respect. In *Leach* v. *Farmers' Savings Bank*, 204 Iowa 1083, 216 N. W. 748, 65 A. L. R. 679, it was decided, quoting from the syllabus:

"The assets of a bank are increased within the rule as to preferences in case of insolvency, by deposits made therein by a city treasurer, of taxes collected in behalf of the city by the county treasurer, who carried his deposit with the same bank and who drew his check, as county treasurer, payable to the city treasurer and delivered it to the latter, who then presented the same to the bank, which, in turn, charged the check to the county treasurer and credited the account of the city treasurer with an equal amount."

To similar effect is *Skinner* v. *Porter*, 45 Idaho 530, 263 P. 993, 995, 73 A. L. R. 59, where it is said:

"Had Summitt presented his checks to the Bank of Hansen and received cash therefor, then handed the cash back to the bank to be forwarded to the Kuna State Bank, and the same was intermingled with the moneys of the Bank of Hansen, it must be conceded that such money would not have been an asset of the Bank of Hansen, although it would have augmented the funds that came into the possession of the receiver. But the situation was not altered by reason of the fact that the Bank of Hansen received checks drawn on it instead of cash (*Goodyear Tire & Rubber Co.* v. *Hanover State Bank,* 109 Kan. 772, 204 P. 992, 21 A. L. R. 677; *State Nat. Bank* v. *First Nat. Bank,* 124 Ark. 531, 187 S. W. 673; *Union State Bank* v. *People's State Bank,* 192 Wis. 28, 211 N. W. 931; *State* v. *Grills,* 35 R. I. 70, 85 A. 281), since the money represented by the checks was actually in the bank."

In *Goodyear Tire & Rubber Co.* v. *Hanover State Bank,* 109 Kan. 772, 204 P. 992, 21 A. L. R. 677, it was held:

"Where a bank holding a claim for collection receives in payment thereof a check upon itself, drawn by the debtor against a sufficient deposit, there being enough cash on hand to meet it, charges the amount to him, and attempts to remit it to the creditor by cashier's check, but passes into the control of a receiver before such cashier's check in due course of business is presented for payment, having at all times had cash on hand in excess of the amount thereof, the creditor is entitled to recover the amount of his claim from the

assets of the receivership as a trust fund in preference to general creditors."

In *Northwest Lumber Co.* v. *Scandinavian American Bank of Seattle et al.,* 130 Wash. 33, 225 P. 825, 827, 39 A. L. R. 922, it was said:

"The lumber company presented its check at a time when the bank was a going concern, when it was open for the transaction of business, and its check was accepted and (in legal effect) cashed by the bank. * * *

"As a final reason against a recovery, it is urged that there was by the transaction no augmentation of the assets of the bank. The fact here assumed is undoubtedly true as applied to the general assets of the bank; that is to say, it is true in the sense that the bank held no greater assets at the completion of the transaction than it held at its beginning. But it is not our understanding that this is the principle upon which the doctrine of augmentation rests. The equitable right to follow misapplied property into the hands of the parties receiving it depends upon the ability of identifying it in specie, or the ability of identifying the property with which it has been confused, or into which it has been converted. If this cannot be done there can be no recovery even though it be shown that the general assets of the estate have been increased to the amount and value of the property. The rule as applied to money which has been intermingled with other money thus means that it must be shown that the mass of money from which it must be taken has been increased by the amount of money which has been misapplied, not that it must be shown that the general assets of the possessor of the money have been increased. In the instant case there is a showing that the money which came into the hands of the supervisor on the insolvency of the bank was greater by the amount of the check than it would have been had the bank performed its duty and made the actual segregation, and in consequence an augmentation of that mass."

The bank was not the owner of this fund, it was simply a trustee, and, when it failed to set aside the amount of the deposit as a trust fund, it thereby, to that extent, augmented or increased the assets or cash in the hands of the trustee bank which came into the hands of the commissioner.

Our attention has been called to *Bledsoe* v. *Hammons,* 36 Ariz. 489, 287 P. 297, as holding that the transfer of a credit

from one account to another in a bank does not constitute an augmentation, particularly where there was no change of ownership of the fund. In that case one Fredericks, treasurer of a lodge, had kept the lodge funds over a period of several years in his own personal account. A few days before the bank closed he drew checks on his personal account in favor of himself as treasurer of three different lodge funds and deposited such checks. The court held there had been no change in Fredericks' relation to the fund and no change in the ownership of the fund by such transaction, and that both before and after the depositing of the three checks the fund had been held by the bank as a general deposit, and that as between Fredericks and the bank the funds had no trust quality. Because the facts are quite dissimilar to those before us, the case cannot be regarded as being in point.

The defendant argues, however, that practically all of the $333,227.11 cash on hand in the bank and in its depository banks was already trust money and could not properly be paid out on the $120,000 check. On that day public moneys were on deposit in the bank as follows: Tooele county $314,505.56, Tooele City general fund $10,150.74, Tooele City waterworks fund $3,927.98, or a total of $328,-584.28. The money which the county treasurer had on deposit in the bank was a trust fund by reason of the fact that it had been deposited without taking of the security required by law, but this money did not belong to the county treasurer, nor did all of it belong to Tooele county. It was owned in proportionate parts by the taxing units for which it had been collected. Included within that sum was the money which had been collected as taxes for the board, and when the county treasurer gave her check for $120,000 it was an allocation by her of that amount of money belonging to the board, and, so long as the bank had sufficient funds with which to pay the $120,000 check, and it did have sufficient on the day when the check was presented, that money was and always has been, since it was first deposited by the

county treasurer, a trust fund belonging to the board. By making and delivering this check the county treasurer merely transferred the naked title from herself to the board. The laws of the state provide for the collection of school taxes by the county treasurer, but obviously these moneys when collected do not become the property of the treasurer. She is merely the custodian of the fund. The taxes belong to the various taxing units for whose use and benefit the taxes are levied and collected. *Lancaster County* v. *State,* 74 Neb. 211, 104 N. W. 187, 107 N. W. 388; *Pinal County* v. *Hammons,* 30 Ariz. 36, 243 P. 919. Whichever view we take of the situation we think it clear that the deposit of $120,000 should be impressed with a trust in favor of the board.

We are next concerned with the question of whether the board has traced and identified the deposits made by it. Having determined that the $120,000 deposit should be treated as a trust fund, the same as the deposits totaling $63,448.86 which the trial court found was impressed with a trust, we may consider all the deposits together. The authorities are generally agreed that the right of a cestui que trust to reclaim trust funds in specie, or impress the trust upon other property in the hands of the trustee, is founded upon the right of property and not on the ground of compensation for its loss, and hence the beneficiary of a trust fund is not entitled, merely because of the character of its claim, to payment out of the insolvent trustee's assets in preference to general creditors, but he must trace and identify the trust funds in order to reclaim them. *Kent* v. *Kent,* 50 Utah 44, 165 P. 271; note 15 L. R. A. (N. S.) 1100; *Meyers* v. *Matusek,* 98 Fla. 1126, 125 So. 360; *Leach* v. *Farmers' Savings Bank,* supra. There are, however, well-established principles which govern the duties of a cestui que trust, as depositor in a bank, who seeks to trace and reclaim his fund. It is well settled that, when a trustee wrongfully commingles trust funds with his own funds, equity will impress the trust upon the entire mass with which the trust fund has been commingled

in order to permit the reclamation of the trust fund. *Waddell* v. *Waddell*, 36 Utah 435, 104 P. 743. The leading case in which the principles applicable to this situation were announced is the English case of *In re Hallet's Estate*, 13 Law Rep., Chancery Div., 696. There the rule was laid down, which has since been followed with almost unbroken uniformity, that the cestui que trust will not be called upon to identify particular money constituting his trust fund, but that, if the trustee has mingled the trust funds with his own, the entire mass is impressed with the trust to the extent of the amount of the trust funds, and, where the trustee has made payments from the mingled fund he will be presumed to have expended for his own use and benefit, first, his own money, and, lastly, the trust fund, and that the cestui que trust will be permitted to recover from such mingled fund, and in preference to common creditors, the amount of money representing the lowest balance to which the mingled fund fell from the inception of the trust to the date of insolvency. There may be some qualifications to this general rule, but, so far as this case is concerned, the principles stated are applicable. The rule is also stated as follows: "The same rule as to identifying or tracing the funds applies to public as to private funds. The money must be identified or traced into some other specific fund or property. There is a presumption, however, that what remains at the time of insolvency is a trust fund. The law presumes that trust funds were not appropriated and that a balance of cash in the hands of the depositary is the trust funds." 22 R. C. L. 231.

In case the mingled fund is sufficient to pay the trust claimant in full, the presumption is that only the money of the trustee has been expended, but, where the trustee has expended, not only his own money out of the mingled fund, but has also dipped into and expended part of the trust fund, the trust claimant will be entitled to recover only the amount which remains, and he is entitled to recover this, even though the balance is less than the total

of the trust fund. *Hawaiian Pineapple Co.* v. *Browne,* 69 Mont. 140, 220 P. 1114; also Note L. R. A. 1916C, 86.

The law has been failrly stated in the Wyoming case of *Lusk Development & Improvement Co.* v. *Günther,* 32 Wyo. 294, 232 P. 518, 520. We quote extensively from this decision for the reason that counsel for both parties agree that the rules announced in this case are applicable to the present situation:

"Starting out, then, with this established principle, that money in the case at bar must be traced and identified in some specific fund or property in the hands·of the receiver—not, however, the identical money paid in—the question remains, whether, indulging in all proper presumptions, that has been done in this case. The burden of proof to do so is on the cestui que trust. 39 Cyc. 532. But, when certain facts are shown, a presumption may aid him and the burden to produce further evidence may shift to the opponent. *First Nat. Bank* v *Ford,* 30 Wyo. 110, 216 P. 691, 31 A. L. R. 1441. The presumption is that men act honestly; that when a trustee mingles trust money with his own, and then draws out sums from a common fund by check or otherwise, it will be presumed that he drew out his own in preference to the trust money. 39 Cyc. 539; cases in note [L. R. A.] 1916C, 77 et seq.; *Waddell* v. *Waddell,* 36 Utah 435, 104 P. 743. This principle has frequently been applied to cases where an insolvent, at the time of the insolvency, had a certain balance of money on hand which went into the hands of the receiver, and in such case it has frequently been presumed that such balance included the trust money, *State* v. *Foster* [5 Wyo. 199, 38 P. 926, 29 L. R. A. 226, 63 Am. St. Rep. 47], supra; cases in note L. R. A. 1916C, 78-82. This, of course, is only a presumption, and will not stand against evidence; and it is a part of the rule applicable to the following misappropriated moneys into a bank account, that if, at any time during the currency of the commingled account, the amounts drawn out leave a balance less than the amount of the trust money, the trust money must be regarded as dissipated to that extent, leaving the trust to be impressed only on the smallest balance that appears to have been on hand at any time during such period. The sums subsequently added to the account from other sources cannot be attributed to the trust money." See, also, *Skinner* v. *Porter,* supra; *Farmers' Bank* v. *Bailey,* 221 Ky. 55, 297 S. W. 938; *Widman* v. *Kellogg,* 22 N. D. 396, 133 N. W. 1020, 39 L. R. A. (N. S.) 563; Note, L. R. A. 1916C, 21; 27 Harvard Law Rev. 125.

The evidence is sufficient to show that the entire amount claimed by the board has been traced into the funds of the defunct bank, not only the moneys kept in its own vaults, but those on deposit in the Utah State National Bank. The amount deposited by the county treasurer of $186,706.96 on December 22, 1930, became immediately ■ a trust fund and in this amount was included the $120,000 which had been by the county treasurer allocated to the board and represented by the check which the board deposited on the 24th of December. Question is made about the item of $20,850.05 included in this deposit by the county treasurer because this sum was represented by checks drawn upon the bank. At the time this deposit was made there was on deposit in the Utah State National Bank to the credit of the bank $142,908.21, and there was cash on hand in the vaults of the bank on the same day the sum of $23,569.04, so that, had the county treasurer presented these checks to the bank and asked for cash, there was sufficient cash on hand with which to pay them. This being true, the deposit of these checks was equivalent to a deposit of cash to the credit of the county treasurer. In the $186,706.96 deposit made by the county treasurer were checks drawn on outside banks amounting to $165,805.91, which were forthwith deposited by the bank in the Utah State National Bank. Upon this showing we are justified in applying the rule of law which entitled the board to recover as its own and up to the amount of its trust fund on deposit at date of closing the lowest balance to which these mingled funds fell between the date of its deposit and the closing of the bank. Respondents argue that the appellant has not shown what proportion of the county treasurer's deposit belonged to it since the county treasurer was unable to state the exact proportion of such deposit to which the board was entitled. Immediately after making this deposit the county treasurer gave to the board her check for $120,000 drawn upon the bank which represented approximately, if not with absolute accuracy, the proportion of the tax funds

which had then been collected and deposited in the bank to which the appellant was entitled, and thus transferred to its owner that much of the trust fund held in the county treasurer's account. The board claims no more than this amount out of that particular deposit. The county treasurer testified that she had collected general taxes and immediately after the delinquent date, which was December 20th, she consulted with the county auditor and apportioned the amounts collected to the various tax units owning the fund, and as a result of such apportionment this check for $120,000 was made and delivered to the board. The check was evidence of the amount of money the bank held belonging to the board. *Emigh* v. *Earling,* 134 Wis. 565, 115 N. W. 128, 27 L. R. A. (N. S.) 243.

The evidence shows that its account in the Utah State National Bank was treated by the bank in its business transactions the same as if the money were in its own vaults. The larger transactions and those including drafts and checks drawn on other banks than itself were handled through the Utah State National Bank, and the smaller transactions handled by the use of money in its own vaults. It would seem, therefore, that the deposits in both these banks must be considered as one fund, and it is clearly shown that the deposits made by the county treasurer and by the board were divided and found their way into both banks.

With reference to the deposit of $63,448.86 which the trial court found was impressed with the trust, we have little difficulty in concluding that this fund was sufficiently traced into the vaults of the Utah State National Bank. The evidence shows without dispute that these deposits were represented by checks drawn on other banks than the bank and were transmitted direct to the Utah State National Bank and collected and the proceeds were there commingled with other moneys kept on deposit in that bank by the Tooele County State Bank, *Pinal County* v. *Hammons,* supra.

The trial court made a finding to the effect that, at the time respondents took possession of the defunct bank, its

books showed public deposit credits not covered by bond in favor of Tooele county in the sum of $64,-503.72, and it is argued that, since this fund is impressed with a trust in favor of Tooele county, the board cannot be paid out of it. Tooele county is not here claiming to have its moneys on deposit impressed with a trust, and we are not informed that it has made any attempt in any other action, or at all, to have such fund declared a trust fund. Therefore, so far as we are now concerned, we must treat such moneys as moneys of the bank. But if Tooele county, or any other trust claimant, should timely move to have its deposit impressed with a trust and trace such moneys into the hands of the commissioner, then, of course, each of the trust claimants would be entitled to only its pro rata share of the trust funds thus commingled and traced into the hands of the commissioner, if the total amount of such funds was not sufficient to pay each of such claimants in full. *Leach* v. *Farmers' Savings Bank,* supra; *Leach* v. *Grinnell Sav. Bank, et al.,* 205 Iowa 1345, 219 N. W. 483.

A closer question arises in connection with the balance of $1,925.50 to the bank's credit in the Continental National Bank. While it was shown by the evidence that this was the balance which came into the hands of the commissioner from the Continental National Bank, the evidence did not show that any of the funds of the Board went to make up that deposit, nor was it shown that such deposit was used by the bank in its general business the same as was shown with respect to its deposit in the Utah State National Bank, so that it could be regarded as part of one general fund of the bank. Not anything is made to appear as to when this money was deposited in the Continental National Bank or how the account was handled. There is a division of authority on the question of whether all the funds of a bank in depository banks may be treated as one fund for the purpose of following trust funds into

the hands of a receiver. One group of cases holds that trust money must be traced into a specific fund in the receiver's hands, and the other group holds that it is only necessary to trace the trust money into the general assets of the trustee in the receiver's hands and that it is not necessary to trace it into any specific fund. *Myers* v. *Matusek,* supra. The first rule seems to be supported by a majority of the cases and is the rule we are inclined to follow. *Board of Commissioners of Crawford County, Ohio,* v. *Strawn* (C. C. A.) 157 F. 49, 15 L. R. A. (N. S.) 1100. The sum of $1,925.50 should be excluded from the fund in the hands of the commissioner out of which the board is entitled to recover.

Another close question arises in connection with the loans made by the bank between December 22d and the date of its closing amounting to $3,427. It is claimed that these assets should be charged with a trust because the funds from which the loans were made were the commingled funds in the hands of the bank after the deposit of its trust funds was made by the county treasurer. We think, however, it is not sufficiently shown that these loans were actually made out of funds either in the vaults of the bank or in the account of the Utah State National Bank, or that they were not renewals of antecedent loans, and for that reason these assets to the amount of $3,427 will not be included in the fund against which the trust claimants may recover. *Board of Com'rs of Crawford County, Ohio* v. *Strawn,* supra.

It is conceded by the board that the entire mass of the commingled fund is charged with a trust and remains so charged only up to the amount of the lowest balance on hand during the period involved. The fund impressed with a trust out of which the board and other trust claimants must be paid is the lowest balance between the date of deposit, December 22d, and the closing of the bank, which is:

In the Bank (January 12) ....................$ 10,226.31
In Utah State National bank (January 14) .... 122,646.56

    Or a total of .........................$132,872.87

The judgment and decree of the district court is reversed, and the cause is remanded, with direction that findings and decree be made and entered in accordance with the views herein expressed.

Costs to appellant.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.

### On Petition for Rehearing

FOLLAND, J.

Respondents have filed a motion for rehearing or for a modification of the decrees heretofore filed in the cases of *Tooele County Board of Education* v. *W. H. Hadlock,* No. 5230, and *Tooele City* v. *W. H. Hadlock, State Bank Commissioner et al.* (No. 5231) 11 P. (2d) 329. Since the question involved is common to both cases, we shall consider the matter in one opinion. The ground urged for modification is that the court erred as to the amount of the trust fund traced into the hands of the commissioner at the closing of the Tooele County State Bank. We found the trust fund which the Tooele county board of education and Tooele City were entitled to prorate on their respective claims was $132,872.87. It is now argued that this amount should be reduced by the sum of $11,405.60 so as to fix the trust fund at $121,467.27. It is contended the evidence shows this sum represents money which came into the bank as an augmentation of the commingled fund from depositors and sources other than the trust claimants. Under the law and the admission of the appellants the trust claimants are entitled to no part of any moneys subsequently coming into the commingled fund

from other sources. The law is stated in 3 R. C. L. 553 as follows:

"Still it is a part of the rule applicable to following misappropriated moneys into a bank account that if, at any time during currency of the mingled account, the drawings out had left a balance less than the trust money, the trust money must be regarded as dissipated except as to this balance, the sums subsequently added to the county from other sources not being attributed to the trust fund."

That there were deposits from sources other than trust claimants is claimed to be shown by the evidence, and illustrated by the following computations: The amount of trust funds on deposit to the credit of the city, the board, and Tooele county on January 7, 1931, was:

$270,889.81

Cash resources of the Bank January 7 ........ 161,278.08

Balance ............................$109,611.73

Thus the bank lacked $109,611.73 of enough cash to pay the trust deposits on that date.

On January 13, 1931, the day the Bank closed, there was a total of trust deposits of

$231,079.00

Cash resources in Bank .................... 137,529.97

Balance ............................$ 93,549.03

The bank on this date lacked $93,549.03 of enough money to pay the trust claimants. This indicates that, notwithstanding withdrawals by trust claimants during that week there had been augmentations to the commingled fund in the amount of the difference between

$109,611.73

and ..................................... 93,540.02

or .......................................$ 16,062.70

If this amount be deducted from the cash on hand on date of closing, the balance is the correct amount of the trust fund:

| | |
|---|---:|
| Cash resources | $137,529.97 |
| Augmentations | 16,062.70 |
| Balance | $121,467.27 |

The same result is reached by another computation. The evidence shows withdrawals by trust claimants between January 7 and January 13 as follows:

| | |
|---|---:|
| By the Board | $28,278.87 |
| By Tooele County | 11,185.42 |
| By Tooele City | 346.52 |
| Total | $39,810.81 |

If this amount be deducted from the cash on hand in the bank on January 7, the same result is reached showing the amount of the trust fund at the time the bank closed as follows:

| | |
|---|---:|
| Cash on hand January 7 | $161,278.08 |
| Withdrawals by trust claimants | 39,810.81 |
| Balance | $121,467.27 |

The amount withdrawn by Tooele county is substantially the same as the amount of the difference between the trust fund found by us and the reduced fund which is now claimed to be the correct trust fund. Because Tooele county was not here claiming to have its moneys on deposit impressed with a trust, we thought, when writing the decision on file, we should not consider the withdrawals by the county in reaching conclusions with respect to the amount of trust funds

against which these appellants would be entitled to draw. However, on a re-examination of the arguments, we are convinced we should consider these factors, not for the purpose of establishing a trust fund for Tooele county, but as proof that the commingled fund had actually been augmented by deposits from sources other than from trust claimants. That the trust fund fixed by us included deposits by general depositors to the amount of $11,405.60 we think is fairly established. Counsel for appellants in their reply to petition for rehearing concede as much, wherein they say:

"Between January 7th and January 13th, 1931, certain funds were undoubtedly received by the bank. These may have come to it because of the payment of notes owed to the bank, they may have come from the sale of bonds or other securities, they may have come from deposits of customers. They undoubtedly did come from all three and numerous other sources. In any event, they were presumably funds' owned by the bank, or of which it became the owner and with which it had the right to do as it saw fit."

Appellants, however, seek to avoid the force of this situation by saying that the bank used, not only the funds of trust claimants to pay withdrawals made by the city, county, and the board, but also used moneys which came from other sources, and argue that this fact has no bearing on the case. They also say that the funds of the bank were not increased or augmented by such deposits. It would seem clear that the evidence shows an augmentation to the amount claimed, although the commingled fund, as augmented, was also depleted to the amount of the withdrawals by trust claimants. It is conceded by appellants that subsequent additions of money other than trust funds to the commingled fund cannot be claimed by them as part of the trust fund in the hands of the commissioner. It is also the rule that such additions cannot be impressed with a trust in the absence of evidence of restoration by the trustee with the intention of replenishing the trust fund. There is no presumption that subsequent additions are a restoration of trust funds. 26 R. C. L. 1358, 2 Perry on Trusts and Trus-

tees, 1408. No evidence was advanced tending to prove that any moneys received by the bank after January 7 and deposited in the commingled fund were intended to be a restoration of the trust fund.

It will be noted that there is a discrepancy between the figures used by the respondents in their computations, which we have followed in this opinion, and the amount found by us in our original decision. The figure used by respondent as the amount of cash on hand at the closing of the bank is $137,529.97. The amount found by us was $132,-872.87, or a difference of $4,657.10. This discrepancy is accounted for and the figures reconciled by these facts. We used the lowest amount of cash in the bank between the date of deposit, January 7, and the date of closing, January 13, which is $10,226.31, the balance on January 12, 1931, whereas, the corresponding figure used by respondents was $14,155.32, which was the amount of cash assets in the bank January 13, the day of closing. As the amount of cash in the Utah State National Bank on the day of closing, which was the lowest balance of the bank in that depository, we used the figure $122,646.56, while respondent used the figure $123,374.65. The ledger sheet shows the latter figure as the amount on deposit in the depository bank on the day of closing, but the cashier of the Utah State National Bank testified that this balance was reduced because of checks not paid to a true balance of $122,646.56. This last sum is the one adopted by us. The difference between these two sets of figures is $4,657.10, which amount we had already used to reduce the cash assets in arriving at the amount of the trust fund. Subtract this sum from $16,062.70, the balance obtained from the above computations and the balance of $11,405.60 represents the amount which should be deducted from the $132,872.87 found by the court in its former opinion as the trust fund, leaving the trust fund, after deducting the amount of interim deposits, $121,467.27.

The original decision will stand as written with the exception that the amount of the trust fund out of which the

trust claimants must be paid is found to be the sum of $121,-467.27 instead of $132,872.87.

The motion for rehearing is denied.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.