[L. A. No. 13645. In Bank.—June 1, 1933.]

BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION (a National Banking Association), Plaintiff and Appellant, v. CALIFORNIA SAVINGS & COMMERCIAL BANK (a Banking Corporation) et al., Defendants and Appellants; JOSE FIGUEROA et al., Cross-complainants and Appellants.

264

'Freston & Files for Plaintiff and Appellant.

Sullivan, Roche, Johnson & Barry for Defendants and Appellants.

Zack Lamar Cobb and Earl A. Littlejohns for Cross-complainants and Appellants.

THE COURT.—The question presented by this appeal is whether the Bank of America National Trust & Savings Association, a national banking association, and Jose Figueroa and Edward G. Brittingham, to whom the defendant California Savings & Commercial Bank is admittedly indebted in the sum of $27,674.44, are general depositors and creditors of defendant bank or are entitled to receive payment in full as preferred creditors, or special depositors, from the cash in its vaults on July 23, 1930, when it was taken over as an insolvent institution by Will C. Wood, Superintendent of Banks of the state of California. Edward Rainey, successor to Will C. Wood as Superintendent of Banks, has been substituted as a defendant herein in place of Wood. The Superior Court of San Diego County, by the judgment appealed from, has decreed that the sum of $16,000 was deposited for a special purpose, and that Figueroa and Brittingham, and Bank of America are preferred creditors as to said sum, but general creditors for the balance of their claim in the amount of $11,674.44. The Bank of America and Figueroa and Brittingham have appealed from said judgment in so far as it denies them a preference for the sum of $11,674.44. The defendant Superintendent of Banks concedes that the Bank of America and Figueroa and Brittingham are entitled in the aggregate to a general claim for $27,674.44, but appeals from that portion of the judgment which allows said creditors a preferred claim for $16,000.

By the complaint as originally filed, the Bank of America sought to have its status as a preferred creditor of the California Savings & Commercial Bank established, or, failing such relief, to obtain a personal judgment against Figueroa and Brittingham for the sum of $15,075.62, later reduced to $9,226.73. Figueroa and Brittingham denied personal liability to the Bank of America for any sum whatsoever, and by cross-complaint asserted a preferred claim for $27,674.44

against the California Savings & Commercial Bank, and further claimed, as against the Bank of America, that by reason of its participation in the three-party transaction which will be fully related hereafter said bank had rendered itself personally liable to them for said sum. By stipulation the plaintiff Bank of America dismissed as to defendants Figueroa and Brittingham, and Figueroa and Brittingham as cross-complainants dismissed as to Bank of America as cross-defendant. It was agreed that the case should go to trial on the sole issue of whether said Bank of America and Figueroa and Brittingham were entitled to recover $27,-674.44 from the California Savings & Commercial Bank as general creditors or on a trust or preferential basis, and that any judgment entered in their favor should be a joint judgment. The rights of Figueroa and Brittingham and the Bank of America *inter se* were made the subject of a separate suit filed in Los Angeles County. We are this day affirming the judgment in favor of Bank of America in said Los Angeles County action, L. A. No. 13611 in this court.

The case herein was tried on a stipulation of facts from which it appears that the rights of the parties are based on a tri-party contract executed by them on April 24, 1930, and herein denominated the exhibit A contract. Figueroa and Brittingham, dealers in cotton, are referred to as the ''Shippers''. They needed credit to finance their operations in the buying and selling of cotton on a large scale, which the Bank of America of California, to which plaintiff Bank of America National Trust & Savings Association is successor, was able to extend to them. Said Bank of America of California, with its principal office in the city of Los Angeles, is referred to in said contract as the ''Bank'', and the defendant California Savings & Commercial Bank, with its place of business in the city of San Diego, is referred to throughout said contract as the ''Trustee''. The Bank of America therein agreed to extend to Figueroa and Brittingham, who appear to have been copartners, ''acceptance credits'' not to exceed $160,000 during the six months' period from April 21, 1930, to October 15, 1930. This figure was later reduced to $90,000 by consent. The acceptance credit was to be made available to Figueroa and Brittingham in the following manner: As they needed funds they were to deliver to the California Savings & Commercial

Bank at San Diego sixty-day drafts drawn on the Bank of America by themselves, Figueroa and Brittingham, payable to their own order and by them indorsed in blank. The San Diego bank was to transmit said drafts to the Los Angeles office of the Bank of America, for acceptance and discount and sale by said Bank of America as prime banker's acceptances. The agreement provided that the proceeds of the acceptances should be "deposited with the Bank [Bank of America] to the credit of the Trustee [San Diego bank] for the account of the Shippers [Figueroa and Brittingham]".

By accepting said drafts prior to sale by it, the Bank of America rendered itself liable to the persons who became the holders thereof. Figueroa and Brittingham agreed to pay all drafts punctually at maturity, and for this purpose to deposit with the Bank of America at least twenty-four hours before noon of the day of payment Los Angeles funds equal to the amount of maturing drafts. To secure performance of this obligation of Figueroa and Brittingham to the Bank of America, the exhibit A contract contains provision for security to be delivered to the California Savings & Commercial Bank as "Trustee". It is therein provided that the Shippers should deliver to the California Savings & Commercial Bank "$24,000 in lawful money of the United States", and also negotiable warehouse receipts and bills of lading evidencing cotton owned by them in such quantities that the value of said cotton, plus the $24,000, should at all times equal 115 per cent of the amount of outstanding drafts drawn by the Shippers and accepted by the Bank of America. The value of said cotton was to be determined from the price on the New York Cotton Exchange.

The $24,000 represents 15 per cent of the total acceptance credit of $160,000, and the sum of $16,000, to which the deposit was later reduced, is approximately 18 per cent of $90,000, the amount to which the total acceptance credit was reduced by consent.

The agreement further provided that if at any time the value of the "cotton pledged", plus the deposit in lawful money, fell below 115 per cent of the amount of drafts outstanding, the Bank of America was authorized to direct the California Savings & Commercial Bank, as Trustee, to sell a sufficient quantity to restore the required margin in

the event that the Shippers failed to deliver additional security in the form of cash and warehouse receipts or bills of lading for cotton. If the Shippers failed to pay, at maturity, any draft accepted for their benefit, defaulted in respect of any of their undertakings in the agreement contained, made an assignment for the benefit of creditors or went into bankruptcy or receivership, the Bank of America was authorized to sell the ''collateral pledged'' by itself or by the Trustee, acting under the bank's direction, at public or private sale. Any surplus realized from the sale over and above the amount due the bank on acceptances was to be paid to the Shippers.

The Shippers further agreed to pay all expenses and commissions incident to the contract and to insure the cotton pledged. They agreed that the credit made available to them by the Bank of America should not be used for purposes of speculating or for the manipulation of the market, and that cotton should be purchased only for the fulfilment of *bona fide* orders received from buyers.

■ On April 24, 1930, the same day that the tri-party exhibit A agreement was executed, the Bank of America and the California Savings & Commercial Bank entered into a contract to which Figueroa and Brittingham were not parties and of which they had no knowledge. They urge in the case herein, and more particularly in the companion appeal, L. A. No. 13611, that said contract, exhibit B, was in fraud of their rights, and altered the terms of the exhibit A contract. We are unable to agree with this contention. Said exhibit B is in effect a contract of guaranty by which the California Savings & Commercial Bank assumed liability for the drafts accepted by the Bank of America for the benefit of the Shippers, and agreed to indemnify and hold the Bank of America harmless on account thereof. It simply afforded the Bank of America additional security, in the form of a guaranty by the California Savings & Commercial Bank, and of this Figueroa and Brittingham had no cause for complaint. There is no showing that the exhibit B contract was intentionally concealed from them.

As noted above, the case was submitted upon stipulations of facts, from which it appears that on April 21, 1930, three days before execution of the exhibit A contract, Figueroa and Brittingham, in contemplation of the provision therein

requiring them to deliver "$24,000 in lawful money" as security, delivered to the California Savings & Commercial Bank their check for $24,000 drawn on an El Paso, Texas, bank, and said check was forwarded by the San Diego bank to the Los Angeles office of the Bank of America "for collection and credit to the account of the California Savings and Commercial Bank". The Bank of America seems to have been the Los Angeles correspondent of the California Savings & Commercial Bank, which maintained a general account with the Bank of America. On payment of said $24,000 check, the Bank of America, as directed, credited said general account of the California Savings & Commercial Bank. From time to time the California Savings & Commercial Bank drew checks against said general account, and made deposits therein. On July 23, 1930, the date of the closing of the California Savings & Commercial Bank, there was a balance of $3,401.18 in the account, which by consent has been credited to the claim of Figueroa and Brittingham and Bank of America to reduce it from $31,075.62 to $27,674.44.

The California Savings & Commercial Bank drew its cashier's check for $24,000, dated April 21, 1930, and payable to the order of the Bank of America, and held said check until May 17, 1930, when it substituted a similar check for $16,000, upon reduction of the total acceptance credit to $90,000 and the proportionate reduction of the required deposit. The California Savings & Commercial Bank returned $8,000 to the Shippers at this time. The balance of the proceeds of said check for $24,000, drawn on the El Paso, Texas, bank and paid by said bank, to wit, the sum of $16,000, the Shippers and the Bank of America claim constituted a deposit for a special purpose. The court below allowed said claimants a preference for this sum, which appellant Superintendent of Banks contests on this appeal.

The Shippers had no knowledge that the proceeds of the El Paso check were not remitted to the San Diego bank in cash, but credited to its general account with the Bank of America; nor did they know that the San Diego bank drew and held its cashier's checks payable to the Bank of America. Neither of said cashier's checks was ever delivered to the Bank of America. The check for $16,000 has

been in the possession of the Superintendent of Banks since the closing of the San Diego bank. The Bank of America, however, was informed by letter of the drawing of the cashier's check for $24,000, and appellant relies strongly on this circumstance, as the holder of a cashier's check is ordinarily held to be a general creditor of an insolvent bank.

As to the balance of the joint claim of Fegueroa and Brittingham and the Bank of America, to wit, the sum of $11,674.44, for which the court below held them to be general creditors, the following facts appear: Said sum represents the balance remaining to the credit of Figueroa and Brittingham in an account in the California Savings & Commercial Bank after deducting the sum of $3,401.18, which was credited them after commencement of the action herein, as explained above. Figueroa and Brittingham opened said account on April 21, 1930, by signing the regular form of signature card used by the San Diego bank for partnership commercial accounts. It is the contention of the claimants for a preference that it was contemplated by the exhibit A contract that Figueroa and Brittingham should sell the cotton pledged to secure the Bank of America, and for which warehouse receipts and bills of lading were delivered to the San Diego bank as Trustee, and that the proceeds of sale should be held by the San Diego bank as a *special deposit* in lieu of the cotton pledged, to assure payment at maturity of the drafts accepted by the Bank of America for the accommodation of Figueroa and Brittingham. This explains the notation written by the San Diego bank on the ledger sheet for the Figueroa and Brittingham account to the effect that "All checks must be O. K. by an officer." The claimants for a preference contend that the balance to the credit of said account actually represents the proceeds from sale of the pledged cotton.

The Superintendent of Banks contends that there is no proof that said balance represents such proceeds. The stipulations of facts in the case herein are incomplete in that they neither affirm nor deny this fact. In view of the clear showing made in the companion case, L. A. No. 13611, as to said account, it would be unfortunate in the instant case if we were required to reach a conclusion at variance with the decision we would make had the undisputed evidence in the companion case been before us in the case

herein. However, we may avoid such a result. It may be conceded, *arguendo,* in disposing of this appeal, that the balance of said account does in fact represent the proceeds of the cotton originally held as security. Nevertheless the judgment decreeing said balance to constitute a general deposit must be affirmed. Said proceeds must be held to have been released from any lien in favor of the Bank of America by reduction of the Shippers' total indebtedness to the Bank of America to a figure ($20,000) where the balance to the credit of said account, in form an ordinary general account, was not needed to afford the Bank of America the 115 per cent margin of security provided for by the exhibit A contract. This matter will be more fully discussed hereinafter. We now proceed to consider the claim for $16,000, as to which we are of the view the claimants are entitled to a preference.

By the terms of the exhibit A contract "$24,000 in lawful money of the United States" was to be held by the California Savings & Commercial Bank, designated "Trustee" in said contract, as "collateral security" for the payment by Figueroa and Brittingham of all drafts accepted for their benefit by the Bank of America. The cotton represented by the warehouse receipts and bills of lading which were also to be delivered to the California Savings & Commercial Bank is throughout the agreement described as "cotton pledged as security". That said cotton did not become the property of the California Savings & Commercial Bank or a part of its general assets, but remained the property of the Shippers, subject to a lien or charge in favor of the Bank of America, can admit of no doubt. The right to sell the pledged cotton, in the event of default in the performance of the obligation to secure which it was pledged, is conferred on the Bank of America, any surplus in the proceeds of sale to be returned to the Shippers. Section 2993 of the Civil Code provides: "A pledgor and pledgee may agree upon a third person with whom to deposit the property pledged, who, if he accepts the deposit, is called a pledge-holder." The California Savings & Commercial Bank, described in the exhibit A contract as the "Trustee", is in legal effect a pledge-holder.

The precise reason for adopting this mode of procedure rather than delivery of the pledge directly to the Bank of

America as pledgee does not appear. It seems fairly apparent, however, that Figueroa and Brittingham sought credit advances from the California Savings & Commercial Bank, and that said bank, which closed its doors two months later, was unable to meet their application, and accordingly sought to obtain such advances on behalf of its clients from the Bank of America. By acting as agent, trustee or pledge-holder the California Savings & Commercial Bank was in a position to charge commissions from Figueroa and Brittingham, and did in fact do so, as indicated by the exhibits in the companion case, L. A. No. 13611.

The requirement of $24,000 in lawful money, to be held as security together with the cotton pledged, was clearly designed to afford security in the form of cash against downward fluctuation in the cotton market. If said security, including the money deposit, had been delivered to an individual as trustee or pledge-holder it would be plain that the relationship of the parties would not be that of debtor and creditor as to said money, and that the pledge-holder would have no right to use such funds in the conduct of his private business. In the case herein, said bank plainly is a pledge-holder as to the pledged cotton. The agreement neither in express terms nor by implication makes a distinction in the capacity in which the said bank is to hold the pledged cotton and the $24,000, also to constitute a part of the security to protect the Bank of America.

Where a fungible, such as money, is made the subject of a pledge, trust or special deposit, in our view it can serve no purpose, and therefore it is not required, that the identity of the particular money delivered be preserved in specie, as by setting it aside in a marked bag or package. The test for determining whether a general deposit or a deposit for a special purpose exists is not, therefore, whether it was intended that specific coins or currency should be kept separate and apart in specie from other funds of the custodian. In ordinary commercial transactions, either with banks or individuals, such an intent almost never will be present, and certainly will not be presumed to exist in the absence of a clear expression thereof. In the case of a general deposit in a bank the relationship of the bank and depositor is that of debtor and creditor, and the funds deposited become a part of the general assets of the bank,

which it may use in making loans and investments and otherwise conducting a general banking business. When the nature of the transaction is such that it must be said that the depositor does not intend that such use shall be made of the amount of his deposit, then it becomes the duty of the bank, not to preserve the identity of the specific coins or currency delivered, or to physically segregate a sum of money, but, rather, at all times to keep on hand cash in a sum equal to said deposit and those of similar depositors, and the amount thereof constitutes a fund which. the bank is not authorized to use in its general banking operations. (See *Missouri Mut. Assn.* v. *Holland Bank Co.*, 220 Mo. App. 1256 [290 S. W. 100, 102].) As to such funds, the amount of which will be indicated by the bank's bookkeeping records, said depositors are entitled to a preference in the event of the bank's insolvency to the extent that the bank's cash has not been reduced below the amount of such deposits, as will be more fully discussed hereinafter.

■ Where money is delivered to a bank to be paid over to a third party upon his fulfilment of a contract with the depositor; where the purchase price of land or other property, or money with which to discharge a mortgage, is delivered to a bank in escrow; where a deposit is made to await the outcome of litigation, or, as in the case herein, as security for performance of an obligation of the depositor to a third person, the deposit is held to be a deposit for a special purpose, and the bank has no right to use the amount thereof in its general business. (*Hudspeth* v. *Union Trust & Sav. Bank,* 196 Iowa, 706 [195 N. W. 378, 31 L. R. A. 466, with note]; *Northwest Lumber Co.* v. *Scandinavian-Amer. Bank, etc.,* 130 Wash. 33 [255 Pac. 825, 39 A. L. R. 922, with note]; *Corporation Commission of North Carolina* v. *Merchants' Bank etc. Co.,* 194 N. C. 125 [138 S. E. 530, 57 A. L. R. 382, with note]; *Blythe* v. *Kujawa,* 175 Minn. 88 [220 N. W. 168, 60 A. L. R. 330, with note].) The deposit herein of $16,000 is clearly of this class.

■ We are aware of expressions in certain cases, including decisions of this state (*Anderson* v. *Pacific Bank,* 112 Cal. 598 [44 Pac. 1063, 53 Am. St. Rep. 228, 32 L. R. A. 479]; *People* v. *California etc. Trust Co.,* 23 Cal. App. 199 [137 Pac. 1111, 1115]), to the effect that a special deposit of money is in the nature of a bailment in which the identi-

cal money deposited is to be returned in specie. A special deposit of this type may be provided for, but the law recognizes a large class of deposits which, if not "special" within this definition, nevertheless are deposits made for a special purpose, which precludes use of the funds by the depositary and entitles the depositor to a preference upon insolvency of the depositary. (See note, 31 A. L. R. 472.)

Appellant Superintendent of Banks stresses the fact that the California Savings & Commercial Bank drew a cashier's check on April 21, 1930, for $24,000 payable to the Bank of America, and later a check for $16,000 when the deposit was reduced, and informed the Bank of America of these checks. Ordinarily the holder of a cashier's check is a general creditor of an insolvent bank. Neither the exhibit A contract nor the exhibit B contract in the case herein contains any provision for holding said fund in the form of a cashier's check. The California Savings & Commercial Bank at all times retained possession of said checks, and the Shippers did not learn that they had been drawn until after the closing of said bank. The California Savings & Commercial Bank by its *ex parte* act could not alter the rights of the Shippers under the exhibit A contract. (*Hudspeth* v. *Union Trust & Sav. Bank, supra.*) Nor do we think that the Bank of America, by assenting to the drawing of said checks in the circumstances of this case, lost the right to rely on the exhibit A contract as creating a deposit for a special purpose. Said checks were mere incidental bookkeeping devices of the San Diego bank and not the controlling factor in the case. (*Central Bank & Trust Co.* v. *Ritchie,* 120 Wash. 160 [206 Pac. 926]; *Woodhouse* v. *Crandall,* 197 Ill. 104 [64 N. E. 292, 58 L. R. A. 385].)

Nor does the fact that the California Savings & Commercial Bank was not licensed under the laws of this state to do a trust company business compel the conclusion that said funds and cotton pledged were not to be held by it by way of special deposit as a pledge-holder. Although said bank is described in the contract as the "Trustee", the transaction appears to present an escrow transaction in the line of ordinary bank business, rather than an administrative trust.

We now pass to consider the nature and extent of the preference of special depositors, and herein to treat

of the question of augmentation of assets of the insolvent bank and the tracing of special deposits into the assets which pass to the trustee in liquidation. It is not the doctrine of the law that special depositors have a prior lien on all *general assets* of the bank in preference to other depositors and creditors by virtue of the fact that the bank's rights and obligations with respect to their funds differ from those attaching to other funds. (*United States Nat. Bank, etc.,* v. *D. W. Standrod & Co.,* 42 Idaho, 711 [248 Pac. 16] ; *Cavin* v. *Gleason,* 105 N. Y. 256 [11 N. E. 504] ; *Cox* v. *St. Anthony Bank etc. Co.,* 41 Idaho, 776 [242 Pac. 785] ; *Leach* v. *Iowa State Sav. Bank,* 204 Iowa, 497 [212 N. W. 748, 215 N. W. 728].) Rather the very generally accepted theory is this: A special deposit of money augments the assets of the bank by the amount thereof. The bank is under a duty to retain in cash at all times, and not to use in its general business, an amount equal to such special deposits. Therefore, as its balance of cash is reduced, it must be presumed that its general funds are being consumed, rather than that its special funds, which it has no right to pay out, are being dissipated. The last cash to remain represents the funds of the special depositors. From this reasoning the rule is deduced that special depositors have, not a lien on the entirety of general assets, but a preference in the lowest cash balance between the date of deposit and the closing of the bank. (*Hudspeth* v. *Union Trust & Sav. Bank, supra; Northwest Lumber Co.* v. *Scandinavian-Amer. Bank, etc., supra; Corporation Commission of North Carolina* v. *Merchants' Bank etc. Co., supra; Blythe* v. *Kujawa, supra; Leach* v. *Iowa State Sav. Bank, supra.*)

The special depositors are in effect tracing and reclaiming their own property, rather than asserting a preference in the bank's general assets. Hence, where the bank's cash balance at any time after receipt of the special deposits falls below the amount thereof, the identity of the special funds is lost, and it is held that the preference of the special depositors does not extend to general assets or to subsequent increases in the cash balance, but as to such receipts the special depositors are on a par with general depositors. This statement of the rule is widely accepted. (See *Leach* v. *Iowa State Sav. Bank, supra.*)

In the instant case the appellant Superintendent of Banks contends that the requirements to establish a preferred claim for $16,000, against the cash in possession of the San Diego bank when it closed have not been met. To provide the $24,000 to be held as security (later reduced to $16,000), Figueroa and Brittingham did not deposit $24,000 in money with the California Savings & Commercial Bank. Instead, they delivered their check for $24,000 drawn on an El Paso, Texas, bank to said California Savings & Commercial Bank, which sent said check to its Los Angeles correspondent, the Bank of America, for collection and credit to its general account with said Bank of America. The California Savings & Commercial Bank drew checks against said account for purposes not disclosed by the record, and exhausted said account except for $3,401.18, which, by agreement of the parties as explained above, has been credited to the claim of Figueroa and Brittingham and the Bank of America. Therefore, contends the Superintendent of Banks, the proceeds of the check for $24,000 are traced to said general account, which largely has been exhausted, and it affirmatively appears that said proceeds are not represented in and cannot be traced to the cash on hand in the vaults of the insolvent bank when it closed. This argument must be rejected in the final analysis.

If the Bank of America upon payment to it of the El Paso check had remitted the proceeds thereof by shipment of currency to the California Savings & Commercial Bank at San Diego, it is conceded that there would be a sufficient tracing to entitle the claimants to priority, with like effect as if Figueroa and Brittingham had personally delivered cash or currency to said bank. But the California Savings & Commercial Bank directed the Bank of America to credit its account. The proceeds of collections in modern banking practice are very generally remitted by the collecting bank sending to the transmitting bank its own draft, or cashier's check, or its draft on another bank, or where reciprocal accounts are maintained, as in the case herein, by the collecting bank crediting the account of the transmitting bank. The San Diego bank adopted this mode of procedure for collecting the check for $24,000, the proceeds of which were to be held as a special deposit. As it checked against its account with the Bank of America, it was under a duty to

substitute therefor, as the fund of special depositors Figueroa and Brittingham, a like sum of the cash in its vaults. The general depositors would not be in a position to challenge the prior claim of Figueroa and Brittingham if the California Savings & Commercial Bank, as it drew against the proceeds of the $24,000 check (deposited in its general account with the Bank of America) and used said proceeds as *cash,* had set aside and marked as the property of the special depositors an equivalent amount from the cash in its vaults. However, we have hitherto indicated that it is not required that there be a physical segregation of money to constitute a special deposit. Rather, at all times the bank's cash balance, provided it does not fall below the amount of the special deposit, will be deemed to contain the amount thereof as a fund which the bank is not entitled to use in its general banking operations. The bank is no more permitted to say that it has wrongfully dissipated the fund of the special depositor in the situation herein, rather than that it has used its own funds, than it is permitted to advance a similar contention where cash or currency has been delivered directly to it. The $16,000 fund of the special depositors Figueroa and Brittingham is traced to the cash balance of the California Savings & Commercial Bank which passed to its trustee in liquidation. (See *Blythe* v. *Kujawa, supra.*)

The credit resulting from deposit of the proceeds of the $24,000 check to the general account of the California Savings & Commercial Bank was the equivalent of cash, and was checked against and used by said bank as cash. Said credit augmented the assets of said bank over and above what they were before the collection by the same amount as a shipment of currency would have increased them. Those cases which hold that where the bank's cash balance is reduced below the amount of the special deposits by paying debts and in general course of its business, the special depositors do not have a preference in the general assets of the bank are not here controlling. (*Bradley* v. *Chesebrough,* 111 Iowa, 126 [82 N. W. 472]; *Hill* v. *Miles,* 83 Ark. 486 [104 S. W. 198]; *Cavin* v. *Gleason, supra; Leach* v. *Iowa State Sav. Bank, supra.*) The cash in the vaults of the bank herein at all times exceeded the total claim of Figueroa and Brittingham and the Bank of America. The court

below acted in accordance with law in sustaining their right to receive payment of the $16,000 special deposit from the cash assets of the insolvent bank in preference to general depositors and creditors.

We have previously stated that their claim for a preference for the balance to the credit of Figueroa and Brittingham in their partnership commercial account with the California Savings & Commercial Bank was properly disallowed by the court below, notwithstanding it be conceded in disposing of this appeal that said balance represents the proceeds from the sale by Figueroa and Brittingham of cotton originally pledged as security. At the time of the closing of the California Savings & Commercial Bank only the last one of the drafts drawn by Figueroa and Brittingham under the $90,000 acceptance credit remained unpaid. This draft was for $20,000. As security therefor, the California Savings & Commercial Bank held the $16,000 special deposit, and also retained control of certain bills of lading and warehouse receipts for cotton pledged and later sold by Figueroa and Brittingham, which documents of title were in transit together with a draft on the purchaser or his agent for $7,372.09 and were to be surrendered only on payment by the purchaser. This draft was paid after the closing of the bank and has been credited on the $20,000 acceptance. The sum of $16,000 plus $7,372.09, aggregating $23,372.09, is more than 115 per cent of $20,000. No portion of the balance in the Figueroa and Brittingham partnership commercial account at the date of the closing of the bank was required to make good the 115 per cent margin of security. Figueroa and Brittingham at any time would have been entitled to demand payment to them of all sums in excess of the amount required to maintain the margin of security. As to such excess the account is a general partnership commercial account. (*Corporation Commissioners of North Carolina* v. *Merchants' Bank etc. Co., supra.*)

The claimants for a preference have already received $3,401.18, which represents the full amount of the balance to the credit of the insolvent bank with the Bank of America on July 23, 1930. As noted above, by stipulation it was agreed that said balance should be applied on the joint claim of Figueroa and Brittingham and the Bank of America to reduce said claim from $31,075.62 to $27,674.44.

We arc of the view that this payment on account must be held to apply on the $16,000 special deposit, and that as a result thereof only a balance of $12,598.82, rather than $16,000, is to be paid to the claimants for a preference from the cash of the insolvent bank which passed to the trustee in liquidation. Said payment of $3,401.18 should not be applied to reduce the balance in the Figueroa and Brittingham partnership account in the California Savings & Commercial Bank from $15,075.62 to $11,674.44, since this would allow the claimants for a preference full payment of a portion of the balance in said account, and we have held herein that they are not entitled to a preference as to any portion of the balance in said account. The result is that the claimants have a preferred claim for $12,598.82, rather than for $16,000, and a general claim for $15,075.62, the balance of the Figueroa and Brittingham general account, rather than for $11,674.44, making a total claim of $27,674.44. To allow the claimants to receive payment of the full $16,000, in addition to the $3,401.18, which they have already received, would give them a preferential payment as to $19,401.18, of the total claim for $31,075.62, whereas they are entitled to the preference only as to $16,000. The judgment of the lower court must be modified as in this paragraph indicated.

■ The court below allowed interest on the sum of $16,000 from October 10, 1930, when demand was made on the trustee in liquidation for payment. *Anderson* v. *Pacific Bank,* 112 Cal. 598 [44 Pac. 1063, 53 Am. St. Rep. 228, 32 L. R. A. 479], may seem to support such an allowance. However, we are of the view that in the case herein interest should not be allowed. It cannot be allowed as compensation for the use of the fund, since it was a special deposit of which no use could lawfully be made. ■ Where the Superintendent of Banks' resistance to payment is not unreasonable or vexatious, but an exercise of reasonable discretion in the interest of all parties, the funds available for the general depositors should not be reduced by allowing the special depositors interest by way of damages. (*Northwest Lumber Co.* v. *Scandinavian-Amer. Bank, etc., supra; Butler* v. *Western German Bank,* 159 Fed. 116; *Richardson* v. *Louisville Banking Co.,* 94 Fed. 442, 449; *Clark Sparks & Sons etc. Co.* v. *Americus Nat. Bank,* 230 Fed. 738; *People*

v. *American Loan & Trust Co.*, 172 N. Y. 371 [65 N. E. 200].)

The judgment is modified by reducing the amount for which additional payment on a preferential basis is decreed from $16,000 to $12,598.82, and by correspondingly increasing (by $3,401.18) the amount for which the general claim is allowed from $11,674.44 to $15,075.62. Said judgment is further modified by striking therefrom the allowance of interest. As thus modified it is affirmed. The motion of Figueroa and Brittingham to dismiss the appeal of Edward Rainey, as Superintendent of Banks, and of the California Savings & Commercial Bank is denied.

Rehearing denied.