In re OGDEN STATE BANK.
SISMAN v. OGDEN STATE BANK et al.

No. 5900. Decided January 28, 1938. (75 P. [2d] 313.)

62

*John C. Davis* and *J. E. Evans,* both of Ogden, for appellant.

*Stuart P. Dobbs,* of Ogden, for respondents.

HANSON, Justice.

In April, 1924, plaintiff and the Ogden State Bank, a banking corporation of Ogden, Utah, entered into a written trust agreement under the terms of which plaintiff delivered certain funds to the bank to be held in trust. Thereafter this agreement was modified and amended so that on October 30, 1930, the trust agreement covered certain stocks and bonds and certain moneys invested by the bank in real estate mortgages. By the terms of the trust agreement as so finally entered into, the trust property held by the bank was to be invested in approved securities, preferably first mortgage loans, for the benefit of plaintiff and certain named beneficiaries, and the net income from the trust was to be held subject to the order of plaintiff during his life and thereafter to the order of the beneficiaries. This agreement was known as trust 118.

On March 18, 1929, plaintiff and the bank entered into four other separate trust agreements known as trusts 118A, 118B, 118C, and 118D. Pursuant to the terms of each of these agreements, plaintiff delivered to the bank $1,000, or a total of $4,000, and the bank agreed to keep such funds invested in approved securities, preferably first mortgage loans, for the benefit of plaintiff and the named beneficiary, the net income to be held subject to the order of plaintiff during his life and thereafter to the order of the beneficiary.

On August 31, 1931, the State Bank Commissioner, hereinafter referred to as the Commissioner, took possession

of the property and business of said bank and proceeded to liquidate its affairs. On that date there was a credit to trust 118 on the books of the bank of $1,404.09 in uninvested cash, representing income receipts from investment of the moneys of such trust. There was also a cash credit on the books of the bank to trusts 118A, 118B, and 118C of $117.02 each and to trust 118D a credit of $117, a total of $468.06, representing income earned by these respective trusts. Shortly after the Commissioner took possession, these various sums were all paid to plaintiff in full. Some time after the payment of these sums, plaintiff was advised for the first time that the bank had used the money delivered to it under each of said trusts 118A to 118D, inclusive, to buy from itself four second mortgage bonds issued by the Hotel Bigelow Company, each having a face value of $1,000. The so-called purchase was accomplished by the bank withdrawing $4,000 from a bank account carried on the commercial side of the bank in the name of the trust department, in which account was carried all uninvested funds of the various trusts of which the bank was trustee, charging the sum of $1,000 against each of the four trusts and placing in the pouch of each such trust one of said bonds as an investment in lieu of the amount so charged against each trust. Later, by mutual agreement between plaintiff and the Commissioner, trust 118 was revoked and plaintiff received the trust res held thereunder. At the same time and by the same agreement, plaintiff rejected the investment of the trust funds in the second mortgage bonds and relinquished to the bank any claim which he might have in and to said bonds. It was also agreed that any claim of plaintiff against the bank for the sums invested in said bonds should be adjusted later, as should also the question as to whether plaintiff was entitled to retain the whole of the sum of $1,404.09 paid to him on trust 118 and the sum of $468.06 paid to him on trusts 118A to 118D, inclusive.

At the trial, plaintiff offered to prove that subsequent to March 18, 1929, when trusts 118A to 118D were executed,

moneys had been used from the funds of said bank in excess of a million dollars for the purpose of making new loans and that of these loans there were loans aggregating at least $350,000 remaining when the bank was taken over by the Bank Commissioner. It was stipulated in connection with said offer, that the sum of $350,000 was in excess of the liability of the bank at all times on uninvested cash items of trust in its hands from March 18, 1929, to the date the bank closed on August 31, 1931. It was also stipulated that the second mortgage bonds were without market value at the time they were purchased as an investment under the trusts by the bank and in real value were worth much less than the amount invested therein. The defendants' objection to this offer was sustained. No further or additional offer of evidence was made by plaintiff.

It further appears that, when the bank closed, the amount of cash and cash assets on hand and coming into the hands of the Commissioner amounted to only 45 per cent. of the amount of trust funds which had theretofore come into the hands of the bank and which had not been invested by the bank so as to be traceable to any specific property outside of the cash and cash assets. So that the claimants of these uninvested trust funds could only get a return of 45 per cent of such funds if resort could be had only to the cash and cash assets coming into the hands of the Commissioner. It also appeared that general creditors had received 60 per cent of their claims.

From the foregoing facts and its ruling on plaintiff's offer of testimony, the trial court concluded that plaintiff was not entitled to look to any of the general assets of the bank for a return of trust moneys, but was limited to receive 45 per cent of such moneys from the cash assets as a preferred claim and 60 per cent of the balance from the general assets, the same as a common creditor. This would entitle him to receive forthwith a total of 78 per cent of his money which was held by the bank as uninvested trust funds. He also would participate in future dividends in the

course of liquidation upon the same basis as a common creditor until paid in full.

The court further concluded that, when the plaintiff rejected the second mortgage bond investment and refused to accept the bonds, he became, as to his claims under trusts 118A to 118D, inclusive, a common creditor and was entitled to participate in the assets of the bank on that basis only.

Applying the foregoing legal conclusions to plaintiff's claim trust 118, the court held that the $1,404.09 held by the bank as income from that trust constituted trust funds, and on this claim plaintiff was entitled to a preference to the same extent as and ratably with similar claims, namely, 45 per cent of the claim from the cash assets and 60 per cent of the balance, or 33 per cent of the entire claim, from the general assets, making a total of 78 per cent of that claim. This would amount to $1,095.19. Since he had been paid the entire sum of $1,404.09, he was bound to return to the Bank Commissioner $308.90 as an overpayment.

As to trusts 118A to 118D, inclusive, since the court considered plaintiff merely a common creditor, it ruled that plaintiff was bound to return the entire sum of $468.06 which he had been paid by the Commissioner in the early stages of liquidation. The court also ruled that plaintiff was entitled, as a common creditor, to 60 per cent of his claim of $4,000, being the amount originally left with the bank under these trusts, or the sum of $2,400. The court then deducted the said sums of $308.90 and $468.06, or $776.96, from the $2,400 and entered judgment entitling plaintiff to receive the balance so resulting, figured by the court to be $1,633.04. (Incidentally, it should be here pointed out that the sum of $1,633.04 is $10 too much and that the correct figure should be 1,623.04.)

Plaintiff appeals from the judgment of the trial court. He claims, first, that he was entitled to retain the whole of the sum of $1,404.09 as he was entitled to a preference on the whole of his claim for that sum; second, that by re-

jecting the second mortgage bond investment he did not become a common creditor but was entitled to a preference on the whole of the $4,000 and so to payment in full of that sum together with interest thereon at the legal rate.

It is clear that the intention of the parties under these various trust agreements was to create an express trust relationship so that the bank would be acting as a trustee with specific duties under each of said agreements. This proposition is not disputed by either of the parties. We shall not undertake, therefore, a discussion of the reasons for making the conclusion just stated, but, using the same as an established premise, shall proceed to dispose of the questions arising therefrom which are presented by this appeal.

Under each of the trust agreements, plaintiff reserved the right to revoke the trust and receive back the securities held by the bank. Also, it was stipulated at the trial that plaintiff was entitled to receive any recovery that might be given as the only party entitled thereto. So we need not consider the possible rights of the beneficiaries named in the trust agreements.

"The right of cestui que trust to reclaim trust funds in specie, or impress the trust upon other property in the hands of the trustee, is founded upon the right of property and not on the ground of compensation for its loss." *Tooele County Board of Education* v. *Hadlock*, 79 Utah 478, 11 P. 2d 320, 324.

"The right to recover a trust fund or property is not based upon the theory of preference by reason of an unlawful conversion, or on account of the nature of the claim, or upon the theory of a debt due and owing, or the relationship of debtor and creditor, or upon the ground of compensation for the loss of the property or fund; but the claimant's right to recovery from the representative of the insolvent bank is based solely upon the theory that since title to the fund or property claimed did not pass to the bank, he is, in effect, recovering his own converted property or the proceeds therefrom." Braver, Liquidation of Financial Institutions, § 855.

Since the beneficial owner of the trust is only recovering that which is his, it follows that he is not entitled merely because of the nature of his claim to a preference or charge

upon the assets of the trustee over general creditors. He must identify the trust property or funds or trace the same in some manner into the hands of the bank's liquidator or receiver. The mere existence of the trust relationship alone is not sufficient to entitle him to a preference. *Tooele County Board of Education* v. *Hadlock,* supra; 82 A. L. R., note at page 52; Braver, Liquidation of Financial Institutions, § 856.

The facts in the case before us show: First, that at the time the Commissioner took over the affairs of the bank the latter was holding for plaintiff's benefit under trust 118 the sum of $1,404.09 which had been received by it as income from the trust property; second, that plaintiff had delivered to the bank under the other four ■ trusts the sum of $4,000, which funds were commingled with the funds of the bank, although shown on the books as having been deposited to the credit of the trust department; third, that the cash coming into the hands of the Commissioner amounted to more than $96,000, which apparently was the lowest amount to which the cash and cash assets had shrunk between the time the bank received the money on either of the trusts and the time it closed. As to the sum of $1,404.09, it is clear that it was not converted into any form of investment, but it continued to remain a cash item. The identical money originally making up this sum and received by the bank could not, of course, be identified. It is traceable, however, under well-established rules, as being a part of the cash assets coming into the hands of the Commissioner.

"It is settled by overwhelming weight of modern authority that where the bank commingles trust funds with funds of the bank, all withdrawals and disbursements by the bank for its own purpose, out of the mixed fund, are presumed to be of the bank's own portion of such fund, rather than of the trust funds, so long as the balance of the common fund remains in excess of or equal to the amount of the trust fund, since it is presumed that the trustee acted rightfully and left the trust funds intact, rather than that he violated the trust, and any balance remaining in the common fund and passing into the hands

of the receiver is presumed to include or to be a part of the trust funds and is subject to the trust." 82 A. L. R., note at page 141.

This rule was approved by this court in the Tooele County Board of Education Case, supra. See, also, Braver on Liquidation of Financial Institutions, § 861, p. 1010. Since the cash assets on hand always remained in excess of the amount of the money held under trust 118, it follows that the foregoing rule applies to that trust. Under that rule, plaintiff's trust money held by the bank has been traced to the cash on hand and plaintiff is entitled to recover from such funds in preference to common creditors. However, since the cash on hand when the bank closed, at which time the cash assets were the lowest they had been since the trusts were executed, was sufficient to pay all claimants having a preference therein only 45 per cent of the amount of their claims, plaintiff can recover from that source only ratably with such other creditors. *Tooele County Board of Education* v. *Hadlock*, supra; Braver on Liquidation of Financial Institutions, § 425, p. 453. Under the evidence, therefore, plaintiff was entitled to receive 45 per cent of his claim of $1,404.09 from the cash on hand when the bank closed and which came into the hands of the Commissioner.

Plaintiff, however, claims that he is entitled to a preference in all of the general assets of the bank for the full amount of his claim. It was upon this theory that plaintiff offered to show that the bank had made new loans from funds in its vaults since the time the trust moneys were received by the bank to the time that the bank was closed and that there remained at the latter time assets made up of such loans more than sufficient to pay all preferred claimants in full. Plaintiff argues that, when his funds were commingled with the funds of the bank and the commingled funds were used to acquire assets, he is entitled to a lien on all such assets.

No effort was made by plaintiff to show at what time since March 18, 1929, the cash assets of the bank on hand fell be-

low the aggregate amount of the uninvested trust funds held by the bank. It is impossible, therefore, to determine when the bank began to dip into the trust funds for use by it for its own purposes, and therefore which of its remaining assets were acquired with trust funds. Likewise, it is impossible to determine whether trust funds were dipped into by the bank to acquire assets or to pay depositor withdrawals or other items resulting in the return of no assets to the bank in lieu thereof. It usually happens that a bank's cash on hand is depleted by the widespread demand for withdrawals in the period just preceding its closing, rather than from acquiring assets with the same. So long as the bank has sufficient cash on hand to cover uninvested trust funds held by it, it cannot be assumed under the rule heretofore stated that it has used trust funds to acquire assets for its own purposes. The presumption is that the trust funds are contained in the cash on hand. For aught that appears in this case, all of the assets which came to the Commissioner, other than cash, may have been obtained by the bank without resorting to trust funds at all. Consequently, plaintiff has not traced, or attempted to trace, his trust funds into any specific property. Since he is entitled to take, as a trust claimant, only that which he shows to be his, he has failed to establish any preferential right in the assets which he sought to show the bank had acquired since March 18, 1929. The offered proof, if received, would not have been of any assistance to plaintiff.

The rule laid down by the great weight of authority is stated in Braver on Liquidation of Financial Institutions, § 859, as follows:

"It is indispensible to the maintenance by the cestui que trust of a claim to a preferential payment by a receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identical piece of property which came into the hands of the receiver, and then the claim can be sustained to that fund or property only, and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its

proceeds went into the general assets of the insolvent estate and increased the amount and value thereof which came into the hands of the receiver. The burden of tracing the trust fund into the assets of the bank in the hands of the receiver, or of identifying it in his hands, rests upon the cestui que trust or claimant."

To the same effect, see 82 A. L. R., note at pages 71 and 92. As to burden of proof, see the same note at page 59. Both Braver and the A. L. R. note cite the Tooele County Board of Education Case, supra. In the absence of a tracing in conformity with the foregoing rule, the plaintiff would not have a lien on the entirety of general assets, but a preference only in the lowest cash balance between the date when he deposited his trust fund and the closing of the bank. *Bank of America Nat'l Trust & Savs. Ass'n* v. *California Savings & Com'l Bank,* 218 Cal. 261, 22 P. 2d 704. It is only to that balance that his trust fund has been traced.

As the lowest cash balance above referred to was insufficient to pay plaintiff's preferential claim in full he was entitled on the balance of his claim to resort to the remaining assets on the same basis as the general creditors. *Beaver County* v. *Home Indemnity Co.,* 88 Utah 1, 52 P. 2d 435.

From the foregoing principles of law, it follows that the evidence offered by plaintiff was immaterial without a tracing of plaintiff's money into some specific assets in the hands of the bank when it closed and that the trial court committed no error in rejecting such offered evidence and in concluding that plaintiff was entitled to receive 45 per cent of the $1,404.09 held by the bank under trust 118 as a preferred claim and 60 per cent of the balance as a common creditor. As heretofore stated, the trial court concluded that plaintiff, upon rejecting the second mortgage bonds which the bank had placed to the credit of trusts 118A to 118D, inclusive, was entitled to participate only as a common creditor in the assets of the bank. In this the court committed error.

The funds delivered to the bank under these trusts were plaintiff's property. Title thereto did not pass to the bank. The bank was authorized to use them for a special purpose only. It appears to be conceded by defendants that the action of the bank in dealing with itself and transferring the second mortgage bonds which were ■ of questionable value to plaintiff's trusts without the latter's knowledge and consent, and thus obtain for itself the full face value of the bonds, was unauthorized, wrongful, and a breach of its trust relationship. Defendants, while conceding this, claim, however, that plaintiff's remedy in such a situation was either to accept and ratify the unauthorized act or hold the bank for breach of trust, and, when he rejected the investment, he made an election to hold the bank for breach of trust and so became nothing more than a common creditor. We cannot agree with defendants' argument. The bank could not force plaintiff, by its own wrongful act, in using the trust fund for some unauthorized purpose either to ratify the unauthorized act by accepting the fruits thereof or be reduced to the status of a common creditor. Plaintiff had a right to reject the purported investment and upon such rejection to receive back his money as his own property. He could not be compelled by the bank's wrongful act to lose title to the property or funds he left with the bank and accept something else which the bank had no power from him to acquire in lieu thereof upon penalty of losing his title anyway and becoming only a general creditor; nor could he be forced to accept a relationship with the bank that he never intended to create or change the relationship that was in fact created when he delivered the trust money to the bank to invest in approved securities.

"Relationships are created by the conduct or agreement of both parties, and not by the voluntary act of one party without the knowledge or consent of the other." *Evans* v. *People's Bank*, 222 Mo. App. 990, 6 S. W. 2d 655, 656.

In the case of *Horne* v. *Rainey,* 3 Cal. App. 2d 382, 39 P. 2d 481, plaintiffs left money with the bank to purchase a certain note and mortgage. The bank purchased some other note and mortgage without plaintiffs' knowledge and consent. When they discovered what the bank had done, they refused to accept the note and security purchased and demanded an adjustment. Shortly thereafter the bank was closed and was taken over by the superintendent of banks. Plaintiffs brought suit to establish their claim as a preferred one. The court held that a trust relationship existed between the plaintiffs and the bank as to the money withdrawn for the purchase of the loan agreed upon. Since the money was not "applied to the purpose for which it was placed in the hands of the bank, it equitably belonged to respondents [plaintiffs] and not to the bank, and the former had the right to trace and reclaim their property."

The case of *Ivie* v. *W. G. Jenkins & Co.,* 53 Idaho 643, 26 P. 2d 794, 796, is also in point on its facts. There plaintiff had left with the bank the sum of $1,000 with which to purchase for her an Australian government bond. After the bank closed, the bank examiner tendered her a Peruvian bond of the face value of $1,000 but having a market value of about $60. Her name was written upon the bond, but that was the first time she had seen the bond or known that the bank was holding it instead of an Australian bond. She rejected the Peruvian bond and sued to establish her claim as a preferred claim. The court held she was entitled to a preference, saying:

"Undoubtedly appellant [plaintiff] has established, as a fact, that her money was received by the bank and it is immaterial what bookkeeping entry was made with respect to it, or whether any was made. If an entry was made showing the money had been deposited or used in violation of appellant's instructions, it would not change the nature of the transaction."

The case of *Miller* v. *Andrew,* 206 Iowa 957, 221 N. W. 543, 545, is also pertinent. There the plaintiff owned a note and mortgage held by the bank for his use and benefit.

The mortgagors paid off the note at the bank and plaintiff instructed the bank to acquire two notes and mortgages with the money so received. One note and mortgage was acquired for plaintiff, but the bank closed before the other could be negotiated. The money, when received by the bank, was credited to plaintiff's checking account without his knowledge or consent. The court held plaintiff was entitled to a preference to the extent of the unexpended moneys so deposited. The court says:

"The fact that the $4,000 paid by the Rooneys [mortgagors] was credited by the employee of the bank to the checking account of the claimant was merely a matter of bookkeeping, and the legal effect of the transaction is to be determined from the facts and not merely from the method of keeping the account." See, also, 82 A. L. R., note at page 166.

In the case at bar the charging of plaintiff's trusts with the sum of $1,000 each and crediting thereto a second mortgage bond was merely a matter of bookkeeping and a transaction wholly within the bank. No money was taken out and paid over to some third person for the bonds. This is not a case, therefore, where the bank transferred plaintiff's money to a stranger in exchange for something else and plaintiff's right to follow that money in the hands of such stranger is not involved.

Under the facts of this case it would be inequitable to permit the unauthorized act of the bank to change plaintiff's status. No loss can result to the creditors of the bank if plaintiff's own property is restored to him. Under the principles of law heretofore stated, the funds found in the possession of the bank at the time the Commissioner took over its affairs must be held to contain, so far as they extend, giving due regard to other trust funds held by the bank, the funds of plaintiff left with it under trusts 118A to 118D, inclusive, as well as the funds held under trust 118. Plaintiff is entitled to have his claim under these four trusts classified as a preferred claim.

As long as the trust funds were uninvested, there would be no earnings thereon. Likewise, since the money belonged to plaintiff and the bank had no right to use it for its own purposes, the bank would not be liable to plaintiff for any interest thereon. In the absence of a statute to the contrary, and we have none, interest should not be allowed on trust funds "unless the banking institution or commissioner has sufficient funds to pay all the depositors and creditors together with interest and the expenses of receivership." Braver on Liquidation of Financial Institutions, § 812; *Beaver County* v. *Home Indemnity Co.,* 88 Utah 1, at page 55, 52 P. 2d 435. There is no showing here that there are sufficient funds to meet the requirements of this rule. Interest should not be allowed as a matter of damages where the Commissioner's resistance to payment is not unreasonable or vexatious but is an exercise of reasonable discretion in the interest of all parties. *Bank of America Nat'l Trust & Sav. Ass'n* v. *California Sav. & Com'l Bank,* supra.

It follows from what we have said that plaintiff was entitled to receive, and therefore is entitled to retain, 78 per cent of the sum of $1,404.09 on trust 118. The other 22 per cent or $308.90, should be returned. Under trusts 118A to 118D, inclusive, he is entitled to receive 45 per cent of the $4,000, the total amount delivered to the bank under these trusts, as a preferred claim. He is also entitled to receive 60 per cent of the balance so remaining as a general creditor. This totals the sum of $3,120. He was not entitled to receive the sum of $468.06, as there were no earnings under these trusts, the money not having been invested, since plaintiff rejected the investment tendered. Deducting the sum of $308.90 and $468.06, namely, $776.96, from $3,120, leaves $2,343.04 as the sum to which plaintiff is now entitled. He is also entitled to participate in future dividends upon the balances remaining unpaid under his respective trusts upon the same basis as general creditors.

The judgment of the lower court is reversed and the cause

remanded, with directions to enter judgment in accordance with the views herein expressed. Appellant to recover costs.

FOLLAND, C. J., and WOLFE, MOFFAT, and LARSON, JJ., concur.